## VON SCHLEGELL, INC., ET AL. *v.* NELLIE I. FORD
### [No. 30, October Term, 1934.]

*Decided November 23rd, 1934.*

The cause was argued before BOND, C. J., URNER, AD-KINS, OFFUTT, PARKE, and SLOAN, JJ.

*Robert D. Bartlett*, for the appellant.

*Foster H. Fanseen*, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This action was brought by Nellie I. Ford, the appellee, in the Superior Court of Baltimore City, against Von Schlegell, Incorporated, and Max Von Schlegell, appellants, to recover damages for injuries she claimed to have suffered as the result of an accident in which she was struck by a motor vehicle, owned by the appellants and operated by their servant, as she was crossing Preston Street at its intersection with Broadway in Baltimore City, early in the evening of December 19th, 1932. The trial of the case before the court and a jury resulted in a verdict and judgment for the plaintiff, and from that judgment this appeal was taken.

There was evidence in the case tending to show these facts: Nellie I. Ford is a real estate agent. On the evening of the accident, returning from an errand connected with her business, she was walking north on the west side of Broadway. There had been a snowstorm on the Saturday before, there was snow "in the street," and, when she reached Preston Street, she found that a footway had been made through the snow, the "regular walkway" where "people walk." She started across Preston Street on that walk, and, when she had reached the middle of the street, or perhaps had gone a little beyond it, she saw a flash and turned her head, and saw an automobile about the middle of Broadway coming towards her. She tried to go faster, but, before she could complete the crossing, it struck her, and she remembered no more until she got to the hospital. The snow at the crossing was piled up along the curb, where it had been scraped from the middle of the street, but there was no snow in the footway. Before she left the curb to make the crossing, she looked to her right and left, but saw no car approaching.

William Scherer, the driver of the automobile, did not know until after the accident that the automobile which he was driving had struck Miss Ford, and it may be inferred from the evidence that he did not even see her until he found her lying on a snow bank after she had been struck. He expressed a belief that the front of his

car did not strike Miss Ford, but there was other evidence that she was struck by its "right front bumper."

After the accident, Miss Ford was removed to St. Joseph's Hospital, where she was examined and treated, and then removed to her home in a city ambulance. Her family physician was called, and he also examined her, and gave her a sedative. After four days her right arm was placed in a cast, where it remained for five weeks. Her right arm and hand were badly swollen, her right side was bruised, her knees were injured, and she had pain in her back. At the time of the trial she had pain in her left side, which kept her awake at night, a condition which did not exist prior to the accident.

Apparently she eventually recovered from all of her injuries except those to her lower right arm and hand, which had caused a loss of the power of rotation, "that is turning of the lower arm from side to side and inability to clench or close the fist." After her arm was taken from the cast, she said that she "did everything in the world she could to try to use her hand," but has failed to recover the complete use of it. It was treated successively by Dr. Shannon, Dr. Marvel, Dr. Pennington, Sr., Dr. Pennington, Jr., and Dr. Nachlas. Dr Nachlas "examined her first a general examination and then took two X-rays, her arm being placed in two different positions, and then gave her treatments. That she went to his office three times a week. That he manipulated treatments but they were so painful he had to give her gas. That he said the arm was so painful she could not stand it. That it was too much torture and that no human being could stand the hand to be twisted as painful as it would be. That when she had gas she was told that she carried on high and that two nurses had to hold her on the table. That she kicked her feet and screamed and carried on. That she continued to have pain in her hand after Dr. Nachlas had put her to sleep. That she had pain in her hand in the middle of last night. That whenever bad weather is coming on she always has pain in the arm."

She first went to Dr. Nachlas on September 28th, 1933, and he gave this description of his treatment: "That he tried to manipulate and bake her hand. That he manipulated it for a while without any rough or radical manœuvre but did not get very far, so in the first part of October he gave the plaintiff an anæsthetic and stretched the adhesions which were limiting the rolling movements, and also the adhesions which limited the fingers. That the contractions of her motion were very rigid, so it took a great deal of force to get them. That he did not get, under the anæsthetic, full correction but got very near full correction of the rotation. That he was able to bend the fingers, cracking a great many of the adhesions, until the hand was in the clenched position. Following that the patient was put up in a sling and he began bakings and massage. That because of the soreness of the arm and hand the treatments had to be modified a great deal and there was again a tendency to stiffen up, and again in the last week of October another manipulation was attempted under an anæsthetic and further motion obtained, following which baking and massage were again resorted to. That altogether her hand was treated twice under anæsthetic and without anæsthetic practically every time she came to the office. * * * That there had been a normal return to movement in the terminal two joints but the proximal joints where the fingers join onto the hand lacked the last third of movement, so that while the patient could bring her fingers into the palm, the clenching power was still lacking. * * * As I indicated a moment ago, the best evidence that I had that there was actual binding factors was the tremendous force—I am fairly husky myself; I do orthopedic work and consequently have to use a great deal of physical strength. I had to use a great deal of physical strength to overcome these contractions even when she was asleep, when she had no contraction on account of her own musculature. * * * That he treated Miss Ford in October and November and two days in September and that his last note is dated December 1st. That he may have seen her since then but there was no radical change since December 1st, 1933.***

"Q. Now Doctor, can you tell his honor and the gentlemen of the jury whether or not the condition of this lady's hand is permanent? A. I don't think it need be permanent if one can continue with active therapy, actual manipulation and massage, I think. Q. Over what period of time, Doctor, would that be required? A. I can't answer that, it is too undetermined. I would have expected ordinarily that the response to these manipulations would be better than it was.'"

When asked to point out to the jury how the right hand differed from the left, he said: "When the elbow is held so that the palm faces up to the ceiling, one has the hand lying flat up, facing up (demonstrating on plaintiff), one can then roll the hand so as to obtain one hundred and eighty degree range of motion on the good side. On the right side, when the elbow is held so it normally faces the ceiling, there is a loss of complete subordination, that is loss of rolling the hand in the 'give me' position, so that the last thirty degrees are lost there. If one holds the elbow solidly and tries to roll the hand in, one finds one can roll that approximately forty-five degrees; no more is obtained. In other words, instead of having the hand turned so the back of the hand faces the ceiling, one can turn it only so far that the thumb faces the ceiling. The wrist movements are slightly restricted—not very much; indorsal flexion. I think one can demonstrate this comes up to forty-five degrees; this comes up only thirty degrees. The last fifteen degrees of extension are lost. In the hands one notes that the last two joints of the fingers flex satisfactorily; they bend satisfactorily, but if one tries to bend this joint here one finds a definite restriction."

Dr. N. Clyde Marvel testified that in his opinion the condition of the hand and arm was due to prolonged disuse, but he further said: "I am not trying to say she has a good arm; I don't mean that at all. I agree absolutely with Dr. Nachlas; what he said this morning is absolutely correct in my judgment, but I certainly do feel that the present condition which she has is because

she didn't take advantage of motions to try to get her arm back into activity before the muscles became contracted, tendons became tight and ligaments became wrapped tighter around the joints, and of course then the shrinking of muscles took place because they were not in activity." And later he testified, in answer to the question whether there was any chance for her hand to get entirely well: "That from his experience as a surgeon and from what he heard Dr. Nachlas testify to, he thinks that with active treatment Miss Ford will probably get almost complete use of her right arm. That he says almost complete use, because he is not going to be flat about it."

He further testified: "What can she do to get back the use of her right hand? A. She will have to bathe it in hot water a good deal. Q. How many years? A. I will not get to that part myself. She will have to bathe it in hot water a great deal; she will have to get some sort of rubber ball arrangement—bulb of some kind which she can squeeze so as to redevelop the muscle strength of the hand; she will have to go through various kinds of exercise. Q. Did you advise her to do that, Doctor? A. I certainly did, long, long ago; the first time I saw her. Q. She has been doing that? A. I don't know. Q. If I told you she has been doing that right along, followed your good advice, and that nothing has happened with all of that good advice, she has dipped her hand in water as hot as she can stand it and she has been baked by Dr. Pennington and Dr. Nachlas, would you change your diagnosis or prognosis? A. No, I don't know that I would, because I feel she can continue and will have benefits by them. Q. Benefits, but will she ever get well and will she get back the use of the arm? A. She has it back a great deal now. Q. I mean the same as before. A. I will not say completely she will get one hundred per cent result; no, I wouldn't say that, but I think if she is earnest about it and puts her faith in her efforts instead of God she will redevelop her muscles."

There are two exceptions in the record, one, the first, to a ruling on evidence, the other to the action of the

court in granting the plaintiff's damage prayer. The first exception was not argued in this court, and as to it it is sufficient to say that whether the ruling involved in it was proper is immaterial, since the witness said that he was unable to answer it, and in fact declined to answer it. The second exception deals with the action of the trial court in granting the plaintiff's damage prayer, by which the jury were instructed that "in estimating the damages they are to consider the health and condition of the plaintiff before the injuries complained of as compared with her present condition, in consequence of said injuries and also the physical and mental suffering to which she may have been subjected by reason of said injuries, together with the expenses, if any, to which she may have been subjected, or will be subjected, as the result of such injuries should they find the same, and the jury are to allow such damages as in their opinion will be a fair and just compensation for the injuries and losses sustained."

It may be noted that nowhere in that prayer is there any specific reference to permanent injuries by that name; nevertheless its phraseology was broad enough to permit the jury, in estimating the damages, to consider whether the injuries which the plaintiff suffered were permanent in their nature. *Mt. Royal Cab Co. v. Dolan,* 166 Md. 581, 171 A. 854. The statement found in the prayer, of the rule of law governing the appraisal of damages in cases of personal injury, considered as a mere legal abstraction, is unobjectionable. *United Rwys. & Elec. Co. v. Weir,* 102 Md. 286, 62 A. 588. Nor was there any objection in this court to the prayer on that ground. But the objection made here, although not so stated, inferentially was that there was no evidence in the case legally sufficient to prove permanent injuries. But, since the appellant failed to except specially to the prayer on that ground, that objection is not open for consideration in this court. Code, art. 5, sec. 10; *Anne Arundel County Com'rs. v. Carr,* 111 Md. 149, 73 A. 668; *Mullen v. Brydon,* 117 Md. 561, 83 A. 1025; *White v. Parks,* 154 Md. 201, 140 A. 70; *Kent County Com'rs v. Pardee,* 151 Md. 72, 134 A. 33.

If the defendants had wanted to exclude the permanency of the injuries as an element of damage, they could have either objected specially to the prayer on the ground that there was no evidence legally sufficient to support that hypothesis, or they could have submitted a prayer limiting the scope of the rule stated in the plaintiff's prayer, but they did neither. It is suggested in the brief that such a prayer was offered but was withdrawn in view of a statement by the court that it was unnecessary to pass upon it because the "plaintiff in her damage prayer did not claim permanent injuries." But there is no reference in the record to any such incident, and, in the absence of some certification or other proof of its occurrence, it is not before this court for consideration. *Chiswell v. Nichols,* 139 Md. 446, 115 A. 790; *Carter's Digest* p. 58 *et seq.*

But apart from that consideration, there was in the case evidence legally sufficient to warrant the court in submitting to the jury the question of the permanency of the plaintiff's injuries. In *Washington, B. & A. Electric R. Co. v. Cross,* 142 Md. 510, 121 A. 374, 377, it was said: "The eleventh prayer sought an instruction that there was no legally sufficient evidence of any permanent injury to the plaintiff as a result of the accident. No medical evidence was introduced, the physician who attended the plaintiff not being in court; but there was testimony that, at the time of the trial, two years and a half after the accident, the plaintiff had not yet recovered from its effects. It was proved that the principal injuries were to her right arm and foot, and that she had never regained their normal use. The description in the evidence of the nature and consequences of the plaintiff's injuries warranted an inference as to their permanence which the prayer failed to take into consideration. It could not, therefore, have been granted as a proper limitation of the plaintiff's permissible recovery.

In this case more than fourteen months after the accident the plaintiff herself said that she could not use her right hand as she did before the accident; that two fin-

gers of that hand were "crooked"; that whenever bad weather comes on she had pain in her right arm; that she had not the same grip with her right hand as before the accident; that she could not completely close the fingers of that hand; that on the night before she testified she had pain in it; that it was "handicapped because of bending the fingers and she could not bend her wrist." Dr. Nachlas testified that the "clenching power" of that hand was still lacking, and that she had lost half the normal rotation, and that, while he thought the condition need not be permanent if "one can continue with active therapy, actual manipulation and massage," he could not say what period of time would be required, that he "would have expected that her response to such treatment would have been better than it was," and that his last memorandum was that, because of her condition, "if anything at all is to be done it will have to be done under another anæsthetic." Dr. Marvel, called by the defendants, said that the limitation of the complete flexion and extension of her right wrist was about thirty per cent.; that she lacked fifty per cent. of the use of the fingers of that hand, and he was unwilling to say that she would ever get complete use of her right arm. That evidence, in view of what was decided in *Washington, B. & A. Electric R. Co. v. Cross, supra,* was at least legally sufficient to support an inference that in some degree the injury to her right arm and hand was permanent.

Finally, we are in effect asked to review the action of the trial court in overruling a motion for a new trial. Conceding for the question that the damages were grossly excessive, and that the trial court in denying a new trial refused relief against a palpable and manifest injustice, nevertheless this court has no power to review its action. It is undoubtedly true that the power of the trial court to grant a new trial to correct what is clearly an unjust and an unwarranted verdict is a useful, indeed an essential, adjunct of the common law system of jury trial, and that the failure of such a court to exercise that power wisely and fearlessly in appropriate cases impairs the useful-

594

ness of that system and tends to bring it into disrepute, but, notwithstanding that obvious truth, it has long been settled law in this state that the exercise of the discreion implicit in the power will not be reviewed by this court. *Griffith v. Benzinger,* 144 Md. 597, 125 A. 512; *Gallagher v. Kornblatt,* 149 Md. 306, 131 A. 450; *Myers v. State,* 137 Md. 487, 113 A. 87; *Chiswell v. Nichols, supra,* and cases there cited.

Finding no errors in the rulings submitted by the record, the judgment appealed from will be affirmed.

*Judgment affirmed, with costs.*