# SALISBURY COCA-COLA BOTTLING COMPANY *v.* ROBERT L. LOWE.

[No. 12, January Term, 1939.]

*Decided February 22nd, 1939.*

232

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*Zanvyl Kreiger*, with whom were *V. Calvin Trice* and *Aiken & Krieger* on the brief, for the appellant.

*Stanley G. Robins* and *Emerson C. Harrington, Jr.*, with whom were *John B. Robins, John William Long, Harrington & Harrington* and *Long & Robins* on the brief, for the appellee.

MITCHELL, J., delivered the opinion of the Court.

On January 14th, 1937, Robert L. Lowe purchased at the oyster shucking establishment of Ralph and Thomas Riggin, in which he was then employed as an oyster shucker, a bottle of beverage familarly known as Coca-Cola. From it he drank three swallows of its contents, resulting in the alleged injury, which forms the basis of the suit from which this appeal arises.

Detailing the circumstances of his purchase and consumption of a part of the contents of the bottle, the appellee testified that on the morning of the happening of the incident he reported for his regular duties, and, there being no work for him to perform on that day, he later went to the second floor of the oyster house, where his employers conducted a restaurant; that one Willie Riggin was then in charge of the restaurant and three other persons were present, when he and two of them decided to purchase three bottles of Coca-Cola; that he was told by Willie Riggin to get the three bottles of Coca-Cola from a carrier in which they were contained; that the carrier was one of five or six filled with Coca-Cola bottles

and piled upon each other in a closet under a stairway in the restaurant; and that the bottles were taken by him from a carrier of the Salisbury Coca-Cola Bottling Company. His testimony then continues as follows: "I opened my Coca-Cola on an opener which was on a post. The Coca-Cola had a lot of gas like any other Coca-Cola, and I put it to my mouth and took two swallows. I had another swallow in my mouth and I wanted to spit it out, but I swallowed that too. As soon as I drank it, my stomach made a funny noise; they all heard it. I felt just like my stomach had turned over. The perspiration bursted out on me and I thought I was poisoned. I did not notice any difference between the Coca-Cola I drank and the Coca-Cola I had been drinking on previous times. The Coca-Cola made me so sick I could not stand up for a while, and I vomited quite a lot. I sat down and rested a while, but I did not get any better; it seemed like I was getting worse. After I drank the Coca-Cola, I noticed it had a reddish color, and when you held it up you could see some oil under it, and when you let it set for a while the oil came to the top. It tasted bad. I smelled the contents after I drank it and it smelled like coal oil or gasoline."

Further testifying, the witness stated that he carried the bottle with its remaining contents to the office of his physician, Dr. Collins, who took from it a sample of the fluid and returned it, and that there still remained in the bottle about one-third of its original contents; that he mailed a sample of the contents to the Salisbury Coca-Cola Bottling Company, with a letter of complaint; that from four to six days after the purchase he gave the bottle to Dr. Ward; that when he handed it to Dr. Collins it was in the same condition as when he drank from it; that when it was redelivered to him by Dr. Collins it was in the same condition, except that a sample of the fluid had been taken from it; that at the time he saw Dr. Collins he was sick and vomiting blood; that the next morning he was in the same condition and could not eat anything; that on the third day he went to his place of

employment to resume work and, as he started to shuck oysters, he felt a knot in the lower part of his stomach and could not work; that he then went to see Dr. Ward, in whose charge his case had been placed by Dr. Collins during the latter's absence, and later went home, where he remained in bed almost continuously, until the 18th day of April, 1937; that, meanwhile, Dr. Ward attended him, and that at times the doctor's visits were two or three times a day; that, before he drank from the bottle of Coca-Cola, he was in perfect health and did not lose time from work, and that he had been in that state of health since he was released from a sanitarium to which he had been sent by Dr. Collins three and one-half years prior thereto; that he had not been able to do any work since the incident happened; that before he drank from the bottle he weighed 142 pounds, and at the time of the trial his weight was 116 pounds; that he paid Riggin for the Coca-Cola; that he knew the Coca-Cola was delivered to the Messrs. Riggin by Mr. Kelly, who was the man who drove the Coca-Cola wagon for the defendant company; that the bottle he purchased had on it the words "Coca-Cola" and "Salisbury, Maryland."

On cross-examination the witness stated that the closet in which the Coca-Cola was kept by the Messrs. Riggin was under a stairway leading to the restaurant, the door to which was kept closed with a "button," and that it was only necessary to turn the button, for the purpose of entering the closet; that he entered it and got the three bottles of Coca-Cola above mentioned, with the permission of Mr. Riggin; that he handed one to Nelson and another to Conner, and kept the third for his own use; that after he opened the bottle he put it to his lips without examining it and began drinking from it; that at first he did not detect any odor or bad taste from the contents; and that he saw the carriers from which he took the bottles, delivered by Mr. Kelly and placed in the closet around two o'clock on the day prior to the date on which he purchased and drank the liquid.

George T. Nelson, who was a consumer of one of the bottles of Coca-Cola referred to in the testimony of the appellee, substantially corroborated the statements made by the latter; he saw Lowe take the bottles out of a case belonging to the Coca-Cola Bottling Company, of Salisbury, and he had seen the cases delivered by Kelly to the Riggin establishment on the day previous to the date on which Lowe purchased the bottle from which he drank; the bottle which Lowe got was capped when he opened it; he found nothing wrong with the liquid in the bottle which Lowe handed him, nor was there anything wrong with that contained in a third bottle consumed by Aaron Conner. He noticed an "awful expression" on Lowe's face just after he drank from the bottle, but did not taste its contents. He examined what was left in the container and it looked thick, red, and different from the contents of the bottle from which the witness drank. Upon smelling the Lowe bottle he detected the odor of kerosene. He stopped Lowe from pouring the remaining contents out of the bottle; the cap was replaced thereon, and he accompanied Lowe to the office of Dr. Collins; the incident took place in his presence and in the presence of Aaron Conner, Willie Riggin and Rachel Smith.

Aaron Conner and Rachel Smith both corroborated the statements made by Nelson as to the manner in which the bottles were obtained from the closet, and what took place when Lowe drank the liquid. Miss Smith also testified that the color of the contents of the bottle was red, and that what was left in it smelt like oil.

It was shown by Willie Riggin, who was in charge of the restaurant, that the Coca-Cola sold by him was delivered by Mr. Kelly, an employee of the Salisbury Coca-Cola Bottling Company, on the day previous to the day on which Lowe made the purchase; that the bottle was in a regular case of the company when Lowe got it, the case being stored in a closet and the outer doors of the establishment being locked when it was not open for business.

Dr. C. C. Ward testified that he had practiced medicine for forty years; that on January 16th, 1937, Lowe came

to see him; that he had a bottle of Coca-Cola which he asked the doctor to examine; that he stated he became ill from drinking from the bottle and had a knot on his side; that he (the doctor) examined the patient and found that he had an incomplete rupture; that Lowe gave him the Coca-Cola bottle when it was about one-third full; that he gave it to John B. Robins (plaintiff's attorney) in the same condition as it was when he received it; and Mr. Robins testified that he received the bottle from Dr. Ward when one-third full; that he kept it locked in his safe, and delivered it to Dr. Collins in the same condition as it was when he received it.

Dr. Collins, testifying on behalf of the plaintiff, stated that he received a Coca-Cola bottle from Mr. Robins on April 26th; that he carried it to Baltimore on April 27th and delivered it to Maurice Siegel, a consulting chemist; that on April 28th he received the bottle from Mr. Siegel in the same condition as it was when he delivered it, except that the latter had removed some of the contents, and that he returned the bottle to Mr. Robins in the same condition, with the above exception, on April 29th.

In previous testimony, Dr. Collins stated that Mr. Lowe came to his office on January 14th, at which time he was nauseated and in intense pain. He was suffering from a toxic condition or acute poisoning of some kind and vomited for half an hour. He showed the doctor a Coca-Cola bottle then about two-thirds full of liquid, which had the odor of gasoline and tasted like a mixture of gasoline and coal oil. The doctor took about two ounces of the fluid for the purpose of an analysis, and noticed at the time that about ten per cent of the contents of the bottle represented an oily substance which floated on the balance of the liquid. Dr. Collins left for Florida shortly after the above date, and did not see Mr. Lowe again until March 1st. At that time he gave the patient a careful examination and found him very much emaciated and suffering from a gastric ulcer.

The doctor stated that he had been Mr. Lowe's physician for twenty years; that in 1933 he developed the

grippe, ran a temperature and had a cough; that he sent the patient to Pine Bluff Sanitarium for observation and examination; that the report from the sanitarium was negative; that Mr. Lowe did not have tuberculosis, and that he afterwards made a "quick pick up" and worked until January 14th, the date on which he drank the liquid. He also testified that the patient did not have a gastric ulcerous condition until after he drank from the Coca-Cola bottle.

After qualifying as a consulting chemist, Mr. Siegel testified that a Coca-Cola bottle was delivered to him by Dr. Collins, and that an analysis which he made from two and a half ounces of the liquid contained therein showed a seven per cent petroleum distillate fluid, which he described as being in the kerosene range, embracing also fuel oils. Describing the gas usually found in Coca-Cola as being carbon dioxide, he stated that it had a mild carbonic taste, and that the pungent taste of carbonic acid in the mouth, in his opinion, would have a tendency to deaden the taste of oil.

William H. Morton testified that he was the proprietor of the Salisbury Coca-Cola Bottling Company, and had been in active supervision of the business since 1911; that on January 15th, 1937, he received by mail a bottle of fluid from Lowe, which he kept in a private cabinet in his office, marked for identification, the cabinet being accessible only to himself and one of his clerks; that he later sent the same bottle and its contents to Penniman & Brown, but did not do this until the suit was instituted in the case. And in corroboration of the above statement of Mr. Morton, Dr. William B. D. Penniman, of the above firm, after qualifying both as a physician and chemist, testified that he received a bottle containing fluid from the defendant company, shortly before September 27th, 1937; that he made an analysis of the fluid, which disclosed no poisonous metals or inorganic materials of any kind; that it was slightly acid, containing one-third of one per cent of acidity by volume and that it "had little or no coal oil in it—none to all practical circumstances."

In his opinion the sample of the fluid exhibited at the time of the trial of the case contained about one-third coal oil, which he described as being a petroleum distillate of the kerosene range. Based on the evidence of Mr. Siegel, Dr. Penniman expressed the opinion, however, that there was kerosene in the bottle from which Lowe drank.

Upon being recalled as a witness, Mr. Morton detailed the design and efficiency of the machinery installed in the plant of the defendant, the purpose and effect of which, according to the witness, was to remove every semblance of foreign matter from empty Coca-Cola bottles before they were refilled. He also detailed a rigid system of inspection of each filled bottle which was conducted in the plant, and identified a photograph of the washing machinery or bottling unit, including the syruper, filler, and crowner, as having been taken in 1930 or 1931. He stated that the photograph showed the same plant which was in use on January 13th, 1937—the date on which the bottle of Coca-Cola in controversy was alleged to have been shipped from the Salisbury plant— and added that, since 1930, when the above machinery was installed, no claim, other than the Lowe claim, had been made against the company because of impurity of its product.

Upon being asked on cross-examination, however, whether prior to 1930 any claim had been made against his company similar to the plaintiff's claim, he admitted that a judgment was obtained against the company by a claimant who brought suit upon the alleged ground that a mouse was found in a bottle of Coca-Cola filled at his plant.

The case was tried before a jury, and the verdict and judgment being for the plaintiff, the defendant, the Salisbury Coca-Cola Bottling Company, took this appeal. The record contains thirteen exceptions, the first twelve of which relate to the rulings of the trial court on questions of evidence, and the thirteenth to its rulings on the prayers. Of the exceptions to the rulings on evidence, however, the fifth and seventh were abandoned in this court, and they will, therefore, not be considered.

The first and second exceptions arose during the examination of Dr. Ward, who, it will be recalled, testified that when he saw the plaintiff on January 16th, and examined him, he found that the appellee had an incomplete rupture. The doctor was then asked by counsel for the appellee the following question: "Could a rupture, such as you saw Mr. Lowe have, been caused by vomiting?" Objection to the question was over-ruled, whereupon the witness answered: "Yes sir, it could," and a motion to strike out the answer was denied. The question was permissible, and, since the answer thereto was responsive, the action of the trial court in over-ruling the objection, and refusing to strike out the answer, was proper.

Standing alone, the information solicited by the question would not have justified the court in submitting the case to the jury, but the witness, a practicing physician, possessed special knowledge of the structure of the human body, including the muscles of the abdomen. Furthermore, he was familiar with the plaintiff's case, and the strains to which, through excessive vomiting, the latter had been subjected; and the scientific knowledge of the witness, to the extent given, in connection with other facts found by the jury, might have been helpful to it in reaching a conclusion as to the plaintiff's right of recovery.

The third and fourth exceptions were taken during the course of the examination of Maurice Siegel, who qualified as a consulting chemist, and who, after testifying to the result of his analysis of a part of the liquid found in the bottle of Coca-Cola from which the plaintiff drank, expressed an opinion that the gas usually found in Coca-Cola is a carbon dioxide, possessing a mild acid quality. He was then asked the following question: "How would that affect a person drinking from a bottle containing oil such as has been described by the witness in this case? Would that deaden the taste in any way, or what?" Objection to the question is urged upon the ground that the witness, as a chemist, was not qualified to express an opinion as to the effect carbon dioxide would have on the

sense of taste. We think the question was admissible, and that there was no error in the above rulings. *Jones on Evidence* (3rd Ed.), sec. 379.

The sixth exception was taken to a question asked Dr. Collins as follows: "What is the present condition of Mr. Lowe with reference to his being able to work?" Dr. Collins, it will be recalled, was the family physician of the plaintiff, who had attended him for the disability forming the basis of the suit. The witness had examined and attended the plaintiff, and was competent to form an opinion of the condition of Mr. Lowe at the time of trial, based on his actual knowledge of his patient's condition, as well as his medical experience; it being for the jury to decide whether the condition of the plaintiff indicated by the witness was, or was not, such as to enable him to pursue his regular or any other line of work. The ruling was correct.

Again referring to Mr. Lowe, Dr. Collins was asked the following question: "Did he or not, doctor, have a gastric ulcerous condition?" Objection to the question was over-ruled, and this ruling gives rise to the eighth exception. In our opinion, for the reasons stated with reference to the seventh exception, the question was permissible, and no error in the ruling by which it was permitted was committed by the trial court.

The ninth, tenth, eleventh and twelfth exceptions were reserved during the course of the cross-examination of William H. Morton, president and treasurer of the appellant corporation, as follows: "Q. In answer to Mr. Trice's question—I understood him to ask you and you answered in the negative—you had not had any claim for damage since 1930, is that correct? A. Yes sir. Q. How many have you had prior to 1930. A. Had one. Q. And was that a claim by someone who claimed there was a mouse in the bottle? A. Someone claimed they found a bottle with a mouse in it. Q. I ask you whether or not your company was sued, and whether or not a judgment was recovered against you? A. They got a judgment for $250. Q. How long ago was that? A. I do not remember. It was ten or twelve years ago."

As has been shown, the witness had testified that the machinery in use in the defendant's plant at the time of the injury complained of was installed in 1930, and that, since the installation, the claim of the plaintiff was the only one of similar type which had been asserted against the defendant. It was permissible, therefore, for the appellee to test the truthfulness of the above statement of the witness; but in our opinion it was error to permit the line of cross-examination to cover a period antedating that embraced in the direct examination.

The reason is obvious. The appellant by way of defense had been permitted to show the care with which the Coca-Cola bottles shipped from its plant were cleansed and filled before being shipped. In establishing the degree of care indicated, he had detailed the process of both washing and filling bottles, made possible through the installation of certain modern machinery, some time during the year 1930. What may have happened in the plant prior to 1930 was not brought out on direct examination and was not proper on cross-examination. In other words, the fact that another and entirely different incident occurred in the plant of the appellant, under different circumstances and when different machinery was in use, had no direct bearing on the subsequent incident. The occurrences were independent and there was no necessary evidentiary connection between them, and, consequently, the admission of the line of testimony found in the next above group of exceptions, instead of aiding the jury in the solution of the subject of inquiry, tended to excite its prejudice, and mislead it. *Wise v. Ackerman,* 76 Md. 375, 25 A. 424; *Sims v. American Ice Co.,* 109 Md. 68, 71 A. 522.

Turning to the thirteenth exception relating to the rulings upon the prayers submitted by the respective parties, at the close of the testimony, it appears that only one prayer was granted at the instance of the appellee, and that by the granted prayer the jury was instructed for the purpose of ascertaining the measure of damages:

(a) "To take into consideration the expense to which

the plaintiff had been subjected by reason of his injuries"; (b) to "also consider the question as to whether the injuries will be permanent in their effect," and (c) "award him such sum as, in their judgment, will be adequate compensation for the injuries which he has sustained and the expense to which he has been subjected."

Special exceptions to the above prayer were filed by the appellant:

(1) Because there was no legally sufficient evidence to establish that the injuries alleged to have been sustained by the plaintiff would be permanent in their effect; and (2) because there was no evidence legally sufficient to establish to what expense, if any, the plaintiff had been subjected by reason of his alleged injuries.

The over-ruling of these special exceptions and the granting of the plaintiff's prayer as offered is the basis of one of the objections embraced in the last exception.

The first special exception we think was properly over-ruled. The trial below did not take place until nearly sixteen months after the appellee drank the fluid. He testified that before the incident happened, he was in perfect health; that for three years he lost no time at his work because of illness; that he had not been able to do a minute's work since; and the testimony of Dr. Ward and Dr. Collins tends to show that the appellee's disability is a permanent one. In the face of the above evidence, and in view of the time which had intervened between the date on which the liquid was consumed and the date of the trial, we conclude that the court was right in over-ruling the first special exception whereby it was sought to have it rule as a matter of law, that the alleged injuries of the appellee were not permanent. *Agricultural & Mechanical Assn. v. Gray,* 118 Md. 600, 601, 85 A. 291; *Washington, B. & A. E. R. Co. v. Cross,* 142 Md. 500, 121 A. 374; *Montgomery Bus Lines v. Diehl,* 158 Md. 233, 148 A. 453; *Cluster v. Upton,* 165 Md. 566, 168 A. 882; *Van Schlegell v. Ford,* 167 Md. 584, 175 A. 589.

With reference to the second special exception we reach the same conclusion. There was evidence, first, of the

plaintiff's extreme and protracted illness; his inability to do any work for a period of sixteen months; his emaciation and general physical condition, and that during the above period he had been constantly under the care of physicians. It is true that there was an absence of proof tending to fix the amounts paid for medical attention, medical supplies or their value; but it cannot be assumed that those items were gratuitously furnished. In other words, while there was evidence of medical attention and loss of time, evidence of the actual amount of expense or loss thereby sustained by the plaintiff was lacking. Under this state of facts, it would have been competent for the defendant to have sought an instruction limiting recovery in this respect to nominal damages, but, in our opinion, the special exception was properly over-ruled.

Four prayers demurring to the evidence in varying forms were offered by the appellant and rejected by the court. The rulings on the first two of these were not pressed in this court.

By the C prayer, the court was asked to instruct the jury that there was no evidence in the case legally sufficient to prove that the gastric ulcer which the plaintiff was alleged to have at the time of trial was the result of drinking the liquid referred to in the evidence; and the B prayer was to the same effect with reference to the rupture with which the plaintiff was alleged to have been afflicted. Without further discussing the evidence, we think that there was evidence bearing upon both of the above subjects of injury, legally sufficient to submit the case to the jury and, consequently, that the court was right in rejecting the indicated prayers. 2 *Poe, Pl. & Pr.,* sec. 295.

Of the remaining prayers offered by the appellant, the first, third, fifth, sixth, seventh and eighth were granted, and the second, fourth and ninth rejected. The exceptions to the rejection of the second and ninth prayers were abandoned in this court, but it is urged that error was committed in the rejection of the fourth prayer. The latter prayer would have instructed the jury that if they

believed from the evidence that the foreign matter or substance was in the Coca-Cola when the plaintiff purchased it, their verdict, nevertheless, should have been for the defendant, unless they further found that the said foreign matter or substance was caused to be in said bottle through the failure of the defendant to exercise such reasonable degree of care and caution as was practicable under the circumstances under which the Coca-Cola was bottled.

We are of the opinion that the instruction sought to be invoked by the above prayer was fully covered by the defendant's first and sixth prayers, both of which, as we have observed, were granted. By the first prayer the jury was instructed that the burden was upon the plaintiff to prove that the alleged foreign matter or substance was caused to be in the bottle in which it was contained through the negligence of the defendant, and that the term "negligence" as used in the prayer meant the failure to exercise the reasonable degree of care and caution practicable under the circumstances of the case. And by the sixth prayer, the jury was instructed, as a matter of law, that the defendant was not the insurer of the plaintiff's health and safety while drinking the contents of the bottle referred to in the evidence, and that for mere accident, unmixed with negligence, no action would lie, even though an injury had been done. As the above instructions covered the purpose of the fourth prayer, its rejection was harmless. *Flaccomio v. Eysink*, 129 Md. 367, 100 A. 510; *Street v. Hodgson*, 139 Md. 367, 100 A. 27; *Goldman & Freiman Bottling Co. v. Sindell*, 140 Md. 488, 117 A. 866.

For the reasons stated, the judgment will be reversed.

*Judgment reversed, and case remanded for a new trial, with costs to the appellant.*