ELIZABETH Y. BYRUM ET VIR *v.* CARLTON MARYOTT ET AL.

[No. 813, September Term, 1974.]

*Decided May 6, 1975.*

This cause was argued before THOMPSON and POWERS, JJ., and MARVIN H. SMITH, Associate Judge of the Court of Appeals, specially assigned.

*John C. Lowe* with whom was *Robert Anthony Jacques* on the brief, for appellants.

*Michael J. Budow* with whom were *Joseph Patrick Clancy* and *Clancy & Pfeifer* on the brief, for appellees.

THOMPSON, J., delivered the opinion of the Court. SMITH, J., dissents and filed a dissenting opinion at page 139 *infra.*

Elizabeth and Barney Byrum, appellants, sued Carlton and Arthur Maryott in the Circuit Court for Montgomery County for damages to Mrs. Byrum and their marital relationship resulting from an automobile accident which occurred in Montgomery County on December 12, 1969. Directed verdicts as to the issue of negligence were granted in favor of the appellants as to Carlton Maryott, the appellee, and in favor of Arthur Maryott. The case went to the jury on the question of damages. The jury returned a verdict of $5000 for Mrs. Byrum's injuries and $2000 for the damage to and interruption of appellants' marital relationship.

After all of the appellants' evidence had been received the appellants attempted to introduce mortality tables into evidence to show Mrs. Byrum's life expectancy. The trial court, after intimating that there was evidence of permanency and after stating that the question was for the jury, sustained the appellees' objection, apparently on the theory that more evidence of permanency was required to lay a foundation for the introduction of mortality tables than to raise a jury question as to permanency.[1] The appellants claim the court erred in excluding the mortality tables. We agree and reverse the judgment.

Courts in Maryland have long recognized the propriety of

---

1. After the conclusion of all the evidence the trial judge sent the issue of permanent injury to the jury.

using mortality or life expectancy tables to give some guidance to the jury in personal injury or wrongful death cases. In *B. & O. R. R. Co. v. Whitacre,* 124 Md. 411, 92 A. 1060 (1915), *aff'd.* 242 U. S. 169, the Court of Appeals stated at 430-431:

> "This evidence [mortality tables] was of course intended as a guide for the jury in determining the proper amount of damages to be awarded. Without some evidence in regard to this before the jury, there was no basis except vague speculation on which to base any verdict. The insurance tables of expectancy, based upon actual experience of the large life insurance companies, while not conclusive, have been recognized to be the best character of evidence obtainable for such purposes, and the evidence objected to by these two exceptions was properly admitted."

See *Hutzell v. Boyer,* 252 Md. 227, 249 A. 2d 449 (1969); *Scott v. James Gibbons Co.,* 192 Md. 319, 64 A. 2d 117 (1949); *Baltimore Transit Co. v. Worth,* 188 Md. 119, 52 A. 2d 249 (1947).

The precise question presented is not *whether* such tables are competent evidence in cases where permanent injuries are shown but rather *when* must the trial judge allow them into evidence. Phrased another way — how much evidence of permanency need the plaintiff produce before the tables should be admitted?

In the vast majority of jurisdictions mortality tables may be introduced if the plaintiff has produced sufficient evidence to present a jury question on the issue of permanency. *United Verde Extension Mining Co. v. Littlejohn,* 279 F. 223 (9th Cir. 1922); *Southern R. Co. v. Cunningham,* 152 Ala. 147, 44 So. 658 (1907); *City of Barnesville v. Powei,* 124 Ga. App. 132, 183 S.E.2d 55 (1971); *Macon v. Yaughn,* 83 Ga. App. 610, 64 S.E.2d 369 (1951); *Ruud v. Grimm,* 252 Iowa 1266, 110 N.W.2d 321 (1961); *Dolan v. Simpson,* 269 N. C. 438, 152 S.E.2d 523 (1967); *City of Okmulgee v. Clark,* Okla., 425 P. 2d 457 (1967); *Skultety v. Humphreys,* 247 Or. 450, 431 P. 2d 278 (1967); 50 A.L.R.2d

419. The appellees cite several cases which they say establish the rule that substantial proof of permanency must be adduced before mortality tables can be introduced into evidence; *i.e.*, more than is required to raise a jury question as to permanency. Our review of those cases shows that only two even colorably support that position. In *Dominguez v. Albuquerque Bus Co.*, 58 N. M. 562, 273 P. 2d 756 (1954), the plaintiff's medical expert testifed that it was "impossible to state" whether her injuries were permanent. This was the only evidence tending to show permanence and was contradicted by defendant's medical expert who stated that her injuries would heal in "six months to a year." Based on the evidence the Court held that it was error for the trial court to allow mortality tables into evidence because there was no "substantial" evidence of permanency. We think the New Mexico court's use of the adjective substantial was in no way intended to require a higher standard of proof than that recognized in the majority of American jurisdictions. In *Atlanta & St. Andrews Bay Ry. Co. v. Pittman*, 130 Fla. 624, 178 So. 297 (1938), a division of the Florida Supreme Court stated that mortality tables are not admissible "unless it be conclusively shown that the plaintiff has sustained permanent injuries." The Court did not discuss the facts of that case. We are not persuaded to follow this isolated language in light of the overwhelming judicial opinion to the contrary.

The question thus remaining is did the appellants produce evidence sufficient to create a jury question with regard to the permanency of the injuries suffered? The general rule in this regard was stated in *Mangione v. Snead*, 173 Md. 33, 51, 195 A. 329 (1937):

> "In other words, before it can be said that the effect of an injury is permanent, it must appear that it is caused by some condition caused by the injury which is not likely to change, but such an inference cannot be drawn from the condition itself, when it is accompanied by no physical impairment or defect, is subjective, and offers no intrinsic *indicia* of its probable duration."

The rule was explained in *Kujawa v. Baltimore Transit Company*, 224 Md. 195, 206, 167 A. 2d 96 (1961) wherein it was stated that, "[c]ertainly evidence tending to show only a *possibility* of permanency is not sufficient to take that issue to the jury." The rule has been applied in a variety of factual situations which fit within one of four typical settings. The first is when the testimony of a medical expert that the injury is permanent is sufficient. *Montgomery Bus Lines v. Diehl*, 158 Md. 233, 240, 148 A. 453 (1929); *Straughan v. Tsouvalos*, 246 Md. 242, 257-258, 228 A. 2d 300 (1967). The second is where the injury by its very nature establishes permanency (loss of limb; wrongful death). *Cluster v. Upton*, 165 Md. 566, 569, 168 A. 882 (1933). The third is where the injury, while not by its nature clearly permanent, leads to an inference of permanency due to the passage of time between the act which caused the injury and the time of trial. *Hebner v. Powell*, 177 Md. 237, 9 A. 2d 232 (1939); *Von Schlegell v. Ford*, 167 Md. 584, 592, 175 A. 589 (1934); *Washington B. & A. R. Co. v. Cross*, 142 Md. 500, 510-511, 121 A. 374 (1923); *United Laundries Co. v. Bradford*, 133 Md. 363, 105 A. 303 (1918). The fourth is where there has been a lapse of time between the injury and trial and there is some expert testimony tending to establish permanency. *Salisbury Coca-Cola Bottling Company v. Lowe*, 176 Md. 230, 4 A. 2d 440 (1939); *Sim-Kee Corp. v. Hewitt*, 13 Md. App. 296, 282 A. 2d 525 (1971).

In *Salisbury v. Lowe, supra,* the Court stated at 242:

> "The trial below did not take place until nearly sixteen months after the appellee drank the fluid. He testified that before the incident happened, he was in perfect health; that for three years he lost no time at his work because of illness; that he had not been able to do a minute's work since; and the testimony of Dr. Ward and Dr. Collins tends to show that the appellee's disability is a permanent one. In the face of the above evidence, and in view of the time which had intervened between the date on which the liquid was consumed and the date of the trial, we conclude that the court was right in

over-ruling the first special exception whereby it was sought to have it rule as a matter of law, that the alleged injuries of the appellee were not permanent."

In *Sim-Kee Corp. v. Hewitt, supra,* the plaintiff testified that he had suffered pain for a period of three years since the injury. A doctor testified that the injuries would continue for an "indefinite period." When questioned further the doctor stated that he would characterize the injuries as permanent. This Court held the evidence sufficient to go to the jury on the issue of permanency.

Our review of the record in the case at bar leads us to conclude that the instant case fits within this last category. Mrs. Byrum testified at trial, approximately 4½ years after the accident, that the back pain she had suffered since the accident persisted and prevented her from continuing in her employment, that she still had speech and coherency problems, that she still suffered occasional blackouts and that the pains in her neck and shoulder persisted although less than originally. Mrs. Byrum also testified that prior to the accident she was employed and took a large part in the administration of the farm and summer camp that she and her husband owned and that since the accident she had not been regularly employed and had been unable to help out with the farm or to open the camp. Mr. Byrum testified that his wife still had extreme difficulty with speech and coherency; [2] that she still suffered considerable pain; that she still suffered occasional blackouts and that she was no longer able to run the summer camp.

Three treating physicians testified in behalf of the appellants. Dr. Jerry S. Farber, an orthopedic surgeon, who treated Mrs. Byrum from May 1970 until March 1972, when asked about a prognosis for Mrs. Byrum's condition stated:

"A. Yes, sir. When the patient was seen in June,

---

2. Recent cases draw a distinction as to whether or not there are physical impairments or only subjective complaints. *See* Raines v. Boltes, 258 Md. 325, 265 A. 2d 741 (1970) and Kujawa v. Baltimore Transit Co., *supra.*

1971, I stated in my records it was difficult to ascertain a prognosis of Mrs. Byrum.

"I felt at that point there was a definite underlying psychological problem. I had difficulty to correlate these specifically with the injury.

"I felt there was an element of psychological overlay. This was definitely affecting the complete recovery from her condition.

"Q. Do you have an opinion based on a reasonable medical certainty whether the symptoms that you have observed in Mrs. Byrum will be of a permanent nature?

\* \* \* \*

"The Witness: It is difficult for me to determine. I would state that I feel psychological problems are eminent in nature.

"The discomfort and difficulties of the neck for which I treated Mrs. Byrum, I felt, had improved significantly by June of 1971, that they would not necessarily be in permanent relation to that if we divided them.

"If, however, we take the total effect of the accident and what I felt to be the preceding psychological problems, that Mrs. Byrum had, signs of permanency to the total condition."

Dr. Richard Conant, also an orthopedic surgeon testified as follows:

"A. The prognosis in her particular case, I would say, is good in that I feel although she is likely to have discomfort from time to time, she should be able to function reasonably well within certain limits.

"Q. Doctor, based on the history and examination findings made by you of Mrs. Byrum, do you have any opinion based on a reasonable medical certainty whether or not her present condition will be permanent?

"A. Let me say that from the history of her problem, it is likely that she will have complaints referrable to her neck for a prolonged period of time; however, let me also say, that there is a possible neurologic problem here perhaps relating to irritation of nerve roots in her neck which I am not referring to and I believe that residuals in that area are best defined by a neurologist.

"I am not rending an opinion in the neurological field. I am confining my opinion to the musculoskeletal system and not to any possible neurological problems.

"Q. In your opinion, will she require orthopedic care for her condition in the future?

"A. It is my feeling that she will most likely be able to manage with supportive care probably by herself for the most part; although, she may require occasional visits if she has any flare-up in her basic underlying condition."

Dr. Elizabeth Sherrill, an internist who treated Mrs. Byrum from January 1972 until the time of trial testified as follows:

"Q. Based on your examination of Mrs. Byrum and the symptoms that you discovered particularly with respect to the chronic cervical strain, do you have an opinion based on reasonable medical certainty as to how long this condition will continue?

"A. I think this has an indefinite answer.

"Q. What do you mean by that, Doctor?

"A. Well, by this I mean some people do have more repairative abilities than others. Can I qualify this in reference to the arthritis?

"The Court: I think you had better answer his question. He will give you an opportunity to answer other questions, Doctor.

"The Witness: Well, I guess I will stop with that answer because I don't know what else I can say.

\* \* \* \*

"Q. What if any effect on the indefiniteness of the chronic cervical strain is the degenerative arthritis?

"A. Well, degenerative arthritis by the law of average gets worse instead of better. Also, the symptoms thereof do vary depending upon activity which may be related to motion of the neck, motion of the shoulders, lifting, extreme high looking up for very long, or extremes of low—any extremes of motion particularly sudden circumstances; so that anyone who has osteoarthritis and degenerative arthritis of 'the spine is a candidate for having chronic neck problems.

"How can I separate what you are going to call a strain and what you are going to call the arthritis. You know I cannot do this. I have no way of measuring what proportion is coming from one thing and what proportion is coming from the other, except that any strain is going to aggravate the symptoms of arthritis."

While the aforegoing medical testimony was not dispositive on the issue of permanency, when taken together with the condition of Mrs. Byrum four and one-half years after the accident, it clearly presented a factual question for resolution by the jury under the decisions in *Salisbury v. Lowe, supra,* and *Sim-Kee Corp. v. Hewitt, supra.* As such it was error for the trial judge not to allow the mortality tables offered by appellants into evidence.

Appellees argue that such error was in any event not prejudicial to appellants because the trial judge instructed the jury that they could consider the question of permanency. They cite *Hutzell v. Boyer, supra,* in support of that contention. In *Hutzell* the plaintiff failed to introduce mortality tables in his suit for permanent disability. The defendant on appeal claimed that that failure was fatal to

the plaintiff's case. The Court of Appeals held that while such evidence would have been helpful its absence was not crucial and that the jury had sufficient evidence from which to find permanent injury. The holding in *Hutzell* dealt exclusively with the sufficiency of evidence. It did not speak to the question of the possible prejudice to plaintiff when mortality tables are excluded. *Gilligan v. Blakesley,* 93 Colo. 370, 26 P. 2d 808 (1933) also cited by appellees is indistinguishable from *Hutzell* and does not support their contention.

In the instant case the only evidence as to life expectancy was the approximate age of Mrs. Byrum at the time of trial. The jury was left to speculate as to the possible duration of Mrs. Byrum's life if they found the injuries she suffered were permanent. She was thus prejudiced by the trial court's refusal to admit the mortality tables into evidence.

> *Judgment reversed.*
>
> *Case remanded for a new trial on the issue of damages as to Carlton Maryott.*
>
> *Costs to be paid by appellees.*

*Smith, J., dissenting:*

I respectfully dissent.

We start with the fact that Annot., *Evidence-Mortality Tables,* 50 A.L.R.2d 419 (1956), states:

> "It appears to be the unanimous view in this country in those jurisdictions where the question has arisen that the admissibility of mortality tables, or testimony pertaining thereto, in a personal injury action is dependent upon proof that the injury was permanent." *Id.* at 421.

I know of no authority in Maryland to the contrary. Therefore, the inquiry must be as to whether there was sufficient evidence before the court to warrant a conclusion that there was permanent injury.

In *Bottling Co. v. Lowe,* 176 Md. 230, 4 A. 2d 440 (1939), quoted by the majority, the Court stated:

> "[T]he testimony of Dr. Ward and Dr. Collins tends to show that the appellee's disability is a permanent one." *Id.* at 242.

The record in that case included testimony by Dr. Collins:

> "[I]n my judgment he has a seventy-five per cent disability."

In *Sim-Kee Corp. v. Hewitt,* 13 Md. App. 296, 282 A. 2d 525 (1971), cited by the majority, the examination of Dr. Beck relative to the plaintiff's injuries as stated by this court includes:

> "Mr. Abato: 'Alright sir, thank you. Now doctor, can you also state with a reasonable degree of medical probability, whether the Plaintiff will have any permanent disability as a result of the injuries for which you treated him? . . .'
>
> "Dr. Beck: 'I think he will continue to have these pains for an indefinite period of time. Whether you want to call it permanent or not, I don't know.'
>
> "Mr. Abato: 'Well, what do you call them, sir?'
>
> "Mr. [sic] Beck: 'I would characterize them as permanent.' " *Id.* at 300.

Accordingly, I conclude that neither *Bottling Co.* nor *Sim-Kee* is authority for the fact that the combination of passage of time, continued physical complaint, and indefinite or inconclusive medical testimony will suffice to prove permanent injury.

In *Kujawa v. Baltimore Transit Co.,* 224 Md. 195, 167 A. 2d 96 (1961), one of the issues before the Court was whether the trial court properly refused to allow the jury to consider permanency of injuries. The accident took place on November 21, 1956. Trial began on March 8, 1960, a little less

time after the accident than in the case at bar, but not much. Judge Horney there said for the Court:

"In order to understand the exception in so far as the son is concerned, a summary of his injuries and of the testimony concerning them is essential.

"The hospital records disclosed that the son had received a frontal fracture of the skull and a brain concussion. He was hospitalized for six days and was discharged as a 'well boy.' The son was not called as a witness, but the mother testified that he was more difficult to manage after the accident and that he had frequent headaches and dizzy spells and had twice fallen during 'blackouts' after the accident. At the time of the trial he had been suspended from school for disciplinary reasons, but there was also evidence tending to show that he had been somewhat of a problem in school prior to the accident. Other than the medical evidence given by Dr. Gillis there was none to connect the condition of the son (at trial time) with the accident. Dr. Gillis testified that when he began to treat the son about a month after the accident he complained of headaches and dizziness. When asked what effect the injuries he had received might have on the son in the future, the doctor replied:

'I cannot give you a definite opinion. It is too indefinite. This condition may persist or there may be some improvement. It is very, very difficult to determine a matter of that type. The only thing that makes me a little bit dubious about his future is the fact he was injured way back in 1956, * * * and there is still complaint of headaches and dizziness and difficulty in school. Now the usual head concussion symptoms clear up in a much shorter time than that. This boy still has headaches and dizziness. Therefore, I think

there is a probability it may persist. I can't be sure, of course.'

When asked how long the dizziness and headaches would persist, the doctor answered: 'I cannot tell you at all. There is no rule which I can go by * * *. The boy needs further treatment. I think his treatment is helping him some now.' And when he was asked how much longer the treatments should continue, the doctor said 'six months longer.'

"On these facts, the Kujawas contend, since there was some evidence of permanent injury to both the mother and the son, that the question should have been submitted to the jury and that the instruction was therefore erroneous. . . .

"The question here is whether the evidence produced was sufficient to also require submission to the jury of a question as to the permanency of the injuries in addition to the submitted issue involving 'suffering in the future.' We think not.

"Certainly evidence tending to show only a *possibility* of permanency is not sufficient to take that issue to the jury. In *Mangione v. Snead*, 173 Md. 33, 195 Atl. 329 (1937), where the plaintiff was an infant at the time of the accident and there was testimony by his mother that the child was normal before the accident and that after the accident he was stupid and got into mischief all of the time, this Court, in pointing out that there must be something more than a conjecture or possibility of the fact to support a finding of permanent injury, said at p. 51:

'[B]efore it can be said that the effect of an injury is permanent, it must appear that it is caused by some condition caused by the injury which is not likely to change, but such an inference cannot be drawn from the condition itself, when it is accompanied by no physical impairment or defect, is sub-

jective, and offers no intrinsic *indicia* of its probable duration.'

"While it is a fact that Dr. Gillis testified that there was a 'probability' that the headaches and dizziness of the son might persist, he did not and apparently could not say that his condition was such that it was 'not likely to change.' On the contrary, though he could not say how long the condition might last, he stated definitely that he thought 'certainly six months longer.' The doctor's testimony accurately described the son's actual condition and was sufficient to justify the instruction of the court that 'such injuries may extend into the future' but could not be treated as extending 'for the duration of the life' of the son.

"A 'permanent injury' has been variously defined as an injury that will 'last throughout life,' *Colby v. Thompson*, 207 S. W. 73 (Mo. App. 1918); an injury that may 'be followed by permanent impairment of earning power or producing irremedial pain,' *Herndon v. Waldon*, 47 S.W.2d 1047 (Ky. 1932); and an injury 'lasting during future life of injured party,' *Sykes v. Republic Coal Co.*, 22 P. 2d 157 (Mont. 1933). The courts have also drawn a distinction between 'suffering in the future' and a 'permanent injury.' See, for example, *Colby v. Thompson, supra; Stahlberg v. Brandes*, 299 S. W. 836 (Mo. App. 1927). We think the lower court was correct in refusing to allow the jury to consider permanency of injuries under the particular facts of this case. See *Baer Brothers, Inc. v. Keller*, 208 Md. 556, 119 A. 2d 410 (1956), and the cases therein analyzed." *Id.* at 205-07.

In *Craig v. Chenoweth*, 232 Md. 397, 194 A. 2d 78 (1963), Judge Sybert said for the Court:

"The appellants' other contention is that 'there is uncontradicted evidence from which a conclusion of

permanency may be drawn' and that therefore it was error to instruct the jury that they could not return an award for a permanent injury of any type. Again, we are constrained to disagree. The applicable rule as to proof of permanency of injuries was recently set out in the case of *Kujawa v. Baltimore Transit Co.*, 224 Md. 195, 167 A. 2d 96 (1961), wherein it was stated on page 206 of 224 Md. that, '[c]ertainly evidence tending to show only a *possibility* of permanency is not sufficient to take that issue to the jury.' In the present case there was no medical testimony showing, or even tending to show, that the injuries suffered by Mrs. Craig were permanent in nature. Dr. Irey, when asked how long treatment would last, stated '[t]hat would be a guess * * *. It would be hard to say,' and that he could not put any time limit on the duration of the injuries. When the appellants called a Dr. Reynolds (a specialist to whom Mrs. Craig had been referred for treatment to her neck and shoulder), he was not asked whether the injuries were permanent, but it is significant that he did testify that he had discharged Mrs. Craig from formal treatment prior to trial because of her improvement and stated his belief that any further treatment could be administered by the appellant wife herself. Thus there was insufficient evidence to take the issue of permanency to the jury and the trial judge was correct in so instructing them. The judge did, however, instruct the jury that, if they found for the plaintiffs, Mrs. Craig would be entitled to recover for conscious pain and suffering that she endured as a result of the accident, down to the time of trial and for such time in the future as the jury should determine that she would so suffer. This, we think, was all that she was entitled to, under the evidence presented." *Id.* at 401-02.

In *Straughan v. Tsouvalos*, 246 Md. 242, 228 A. 2d 300 (1967), Judge Murphy said for the Court of Appeals:

> "We have consistently rejected the proposition that the jury may form a judgment or conclusion on the basis of testimony which admits of mere possibilities. The test to be applied, whether the question involved be the existence of an injury or its cause, is reasonable probability or reasonable certainty. *Ager v. Baltimore Transit Co.*, 213 Md. 414 (1957)." *Id.* at 257.

The majority opinion states in footnote 2 that "[r]ecent cases draw a distinction as to whether or not there are physical impairments or only subjective complaints," pointing to *Kujawa* and *Raines v. Boltes*, 258 Md. 325, 265 A. 2d 741 (1970). In *Raines* the Court of Appeals reversed and remanded for a new trial on the issue of damages only, holding that the trial judge had erred in his refusal to instruct that there was no evidence of permanent injury. No expert testimony was presented. Judge McWilliams there said for the Court that "[a] plaintiff who attempts to establish future impairment from an injury which is essentially subjective in nature, such as the one in the case at bar [(injury of some type to the back)], without expert medical testimony, bears a heavy burden." It is true that in this case the husband testifed that his wife "still had extreme difficulty with speech and coherency," but in the absence of medical testimony to the effect that these difficulties stemmed from the accident, one could hardly label them as such "physical impairments" as would make expert testimony unnecessary.

In my judgment, the expert testimony here tendered was too nebulous in form to warrant a reversal of the trial judge's refusal to admit into evidence the mortality tables tendered. Accordingly, I would affirm.