## ARMOUR & COMPANY *v.* OLIVE R. LEASURE

[No. 65, October Term, 1939.]

394

*Decided November 29th, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*William C. Walsh* and *W. Earle Cobey,* for the appellant.

*Lewis M. Wilson,* with whom was *Finley C. Hendrickson* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Olive R. Leasure, the appellee in this case, became seriously ill a short time after eating a part of the contents of a can of corned beef which she had purchased from a grocery store in Cumberland, Maryland. The can bore on its label the following representations: On the front and back of the label there appears a dish which contains what appears to be a picture of slices of corned beef, and there is also contained on the dish a picture of

lettuce, pickles and olives. The reading matter on the label is as follows: (Front and Back) "Armour's Star * Trade Mark famous flavors! Corned Beef 12 ozs. net Wt. Made in Brazil Packed for Armour and Company— Chicago, Ill., U. S. A. (Side) Armour's Star * Quality Corned Beef For Corned Beef Hash: Mix 1 can chopped Corned Beef 3 cups chopped cooked potatoes 1 small minced onion, ½ teaspoon salt, ⅛ teaspoon pepper, 2 tablespoons Star Bacon drippings and sufficient milk to moisten. Place in a covered dish bake 15 minutes in a moderate oven, 350 F. Remove cover and continue baking 15 minutes or until brown. Serves 6 average portions. 340 G R M NETO For Sandwiches: This package contains enough Corned Beef, when sliced into ⅛ inch slices, to make 12 delicious sandwiches. Place between slices of bread spread with Cloverbloom Butter and mayonnaise dressing. (Side) Armour's Star * Quality Corned Beef. The name 'Armour's Star' is your guarantee of purity and wholesomeness. To open—attach key and turn right. Remove the contents whole. Wrap unused portion in waxed paper and keep in a cool place. To slice cold chill contents thoroughly before opening. Frigorifico Armour Livramento Brazil Ready to Serve Recommended Serial No. *4413 By the Bureau of Foods Sanitation and Health Good Housekeeping Magazine. The following code marks appear on top of the twelve ounce cans packed by us here: In a circle—the letters BRASIL 7 SIF and just to the left of the circle the letter P, and on the bottom of the container the following letters and numerals: P 1."

On the theory that her illness was a result of defendant's negligence caused by some toxic substance in the corned beef which made it unwholesome, appellee brought this action against Armour & Company, a corporation, the appellant, to recover compensation for the loss and injury which she suffered as a result of her illness. The trial resulted in a verdict and judgment for the plaintiff, and this appeal is from that judgment.

398

There are three exceptions in the record, one, the first, deals with a question of evidence, the other two deal with the rulings on the prayers.

The appellant offered nine prayers, all of which were refused. Each of those prayers sought a directed verdict for the defendant on one or more of several theories, all of which can be considered in connection with the refusal of its general demurrer or "A" prayer.

In dealing with the question raised by the refusal of that prayer it may be said, by way of premise, that the burden of proof was upon the plaintiff to show by legally sufficient evidence that she purchased the can of corned beef from a storekeeper in reliance upon the representation of the defendant, express or implied, that it was edible and wholesome, that the defendant had mediately or immediately sold or delivered the food to the storekeeper for resale in the original package, that it was unwholesome and poisonous, that its toxic quality resulted from the failure of the manufacturer to exercise ordinary care in the manufacture or inspection of the same, and was the proximate cause of appellee's illness.

On the other hand it must be assumed that all evidence tending to support the appellee's claim, and all inferences reasonably deducible therefrom, are true, and, in the absence of any variance prayer, the right of the appellee to recover depends upon the evidence irrespective of the pleadings. *Richardson v. Anderson,* 109 Md. 641, 651, 72 A. 485; *Great Atlantic & Pacific Tea Co. v. Roch,* 160 Md. 189, 192, 153 A. 22; *Toy v. Atlantic Gulf & Pacific Co.,* 176 Md. 197, 4 A. 2nd 757, 767, for, as stated by Judge McSherry for this court: "On demurrer, judgment was given for the plaintiff, on the ground, that, though a man may do a lawful thing, yet, if any damage thereby befall another, he shall be answerable if he could have avoided it. *Broom's Leg. Max.,* 161, and cases there cited. It is true these last cases were in trespass and the declaration now before us is in case. But the prayers at present under consideration are demurrers to the evidence and make no reference to the pleadings; hence

the right to recover depends not upon the form of the action or the state of the pleadings, but solely upon the case made by the proof. *Baltimore Bldg. Assn. v. Grant,* 41 Md. 560, 569; *Leopard v. Chesapeake & O. Canal Co.,* 1 Gill, 222." *West Virginia Cent. & P. R. Co. v. Fuller,* 96 Md. 652, 669, 54 A. 669.

The evidence in the case tended to prove the facts stated in the following narrative:

On May 25th, 1937, the appellee, who was living with her mother, a brother, and a sister, at 537 Columbia Avenue in Cumberland, Maryland, purchased from the Atlantic & Pacific Tea Company store a can of corned beef, which was delivered to her home at about four thirty o'clock in the afternoon of that day. An hour later, in preparing the evening meal, she opened the can, cut off a slice of the beef, placed it on a piece of bread and ate it. For the meal she prepared the corned beef, scalloped potatoes, and sliced fresh pineapple. The corned beef she served as it came from the can, the potatoes she sliced very thin and baked for a half an hour, and she sliced the pineapple thin and put sugar on it. She ate another slice of the corned beef at supper, and her brother and sister also ate part of it, but her mother, who was ill, ate none. One slice was left from the supper and that she put away. They had supper at six o'clock and the corned beef was then in the same condition as when the can was opened. When she opened it she poured its contents on a plate which she placed on the supper table, and at that time she noticed nothing "whatever as to its color or anything like that." At about 8.25, something over two hours later, Miss Leasure, her brother, and her sister, all became violently ill. Mrs. Leasure, the mother, called in Dr. W. F. Williams. Dr. Williams found Miss Olive Leasure, the appellee, in a critical condition, pale, cold, unconscious, with a weak thready pulse, vomiting, and suffering also from diarrhea, and in need of hospitalization. He decided to take all three of them to the hospital, but Olive's condition was so serious that he was afraid to move her at

once, but she was taken to the hospital after the other two had been taken there. She remained at the hospital until May 28th, when she was discharged, but she continued to suffer from "the ill effects" of the attack of illness for several months after that, and her health has never been as good as it was before she became ill.

On the day she became ill Miss Leasure had eaten toast, eggs, and coffee for breakfast, and hot cakes, syrup and coffee for luncheon, and had eaten no meat other than the corned beef either on that day or on the preceding day.

From the history of the case, from her condition when he saw her at her home, and her condition while at the hospital, Dr. Williams diagnosed her illness as botulism. Botulism is defined in the *American Illustrated Medical Dictionary* (1937) p. 222, as, "A type of food poisoning caused by a toxin which is produced by *Clostridium* (*Bacillus*) *botulinum* in improperly canned or preserved foods. It is characterized by vomitting, abdominal pain, difficulty of vision, nervous symptoms of central origin, disturbances of secretion, motor disturbances, dryness of the mouth and pharynx, dyspepsia, a barking cough, mydriasis, ptosis, etc. The term was formerly used synonymously with allantiasis or sausage poisoning."

The corned beef which Miss Leasure ate was manufactured by the Armour of Brazil Corporation, Sant' Anna do Livramento, Rio Grande do Sul, Brazil, and by it sold, and, as part of a shipment of thirty-two thousand cases of twenty-four cans each, shipped by the steamer Pan America to Armour & Company of Illinois, at New York, early in 1937. It was transhipped by the defendant from New York to one of its branches at Altoona, Pennsylvania, and after that defendant sold nine hundred cases of that shipment, including the particular can sold to Miss Leasure, to the Great Atlantic & Pacific Tea Company, and on May 13th, 1937, the case containing that can was delivered to that company's retail store in Cumberland, where the particular can under consideration was sold and delivered to Miss Leasure.

John J. O'Conor, manager of defendant's foreign accounting and import department, said: "Whenever my company makes an offer to the Brazil corporation it is understood that the Armour label marked 'Packed for Armour and Company, Chicago, Illinois' shall be placed on the cans. This label is the customary label placed on our products. It also appears on the label that the Brazil corporation also manufactured and packed these goods." It also appeared that Armour & Company of Illinois owns the stock of the Armour of Brazil Corporation.

Sidney J. MacBey, manager of Armour of Brazil Corporation's plant at Rio Grande do Sul, gave a comprehensive and detailed description of that company's process of manufacturing and canning the corned beef which it produces, and also explained its system of labelling and marking the cans for identification in respect to the time and place of manufacturing and of the several inspections to which the product is subjected.

Without attempting to restate that description, it is enough to say that, beginning with the selection of the cattle used, each step in the manufacture of the corned beef is subject to rigid inspection, and every reasonable precaution taken to insure the production of a wholesome product, free from germs or poisonous substances.

The meat is ground and cooked for thirty minutes in an open vat at a boiling temperature, is then cured in pickle for twenty-five minutes at a temperature of 180 degrees. From the pickle it is transferred to a table, inspected for excess fat, and placed in a stuffing machine which forces it into cans. The cans are placed in a vacuum closing machine where the air is removed and the top sealed on the can. After that the cans are placed in a sealed retort and subjected to a temperature of two hundred and forty degrees, F., for two hours and ten minutes. They are then cooled by running water over them for one and one-half hours. When they are taken from the retort they are placed in an incubating room where a temperature of eighty-five degrees is maintained and allowed to remain there for one week. They are then

taken out, inspected, and labeled, and returned to the incubating room, where they remain for a further period of three weeks. After that they are boxed and stored.

They are inspected when removed from the retort by the Brazilian Government and by the corporation employees, and are inspected again when first taken from the incubating room, and again when finally removed from that room, and when shipped they are given a final inspection at the factory. During the day of the pack which included the can of beef sold to Miss Leasure, samples were taken on four different occasions, and subjected to a laboratory analysis to make sure that the finished product was wholesome. The entire process of manufacture is under the supervision of the Brazilian Government. When the product arrives in the United States it is again inspected, and if, as a result of any of these inspections, a can is found to be defective, it is rejected and condemned.

The incubating process is to develop any latent defects, because if the can is defective the contents will spoil and the ends swell.

Charles C. Arrera, defendant's employee, went to the Leasure home and asked that he be given the slice of the corned beef which was left from the supper. That request was refused but he was shown the can from which it had been taken and permitted to copy the label. He only saw two members of the family, a man and a woman, but did not believe that he saw the appellee on that occasion. He also visited the store where that can had been bought, and found two of the "same cans" remaining there. He bought them and sent them to appellant's chemical laboratories in Chicago, where their contents were subjected to a bacteriological analysis and also fed to guinea pigs and rats. These tests disclosed that the contents of the cans were free from bacteria or toxic substances and that they were wholesome.

Dr. Williams, appellee's attending physician, who had practiced medicine for twenty-three years, had in his practice attended one case of botulism, and had only seen

two cases, both "many years ago," and apparently relied largely for his knowledge of the etiology of the disease on a medical work called the *"Encyclopedia of Medicine"* by Pierce Hall of Philadelphia, although apparently he had read other books on the subject. He defined botulism as "A disease caused by an organism that is present in foods, that gains access to the food, and upon the ingestion of it, gives rise to the symptoms in the individual."

He said nothing of the kind or quality or the condition of food in which the bacillus is ordinarily or necessarily found, but agreed with other expert witnesses that any organisms in the can would be destroyed by a temperature of two hundred and forty degrees maintained for two hours and ten minutes.

He testified that in his opinion, based upon his personal examination of her, the history of the case, and his knowledge of the disease, the illness from which Miss Leasure suffered was botulism.

He was then asked to state, in answer to a hypothetical question, his opinion as to "what was the cause of the botulism in the plaintiff, Miss Leasure," and he replied, "That the corned beef was the cause of it. May I add * * * the history as I was able to gather it, after, was to the effect that Miss Olive had eaten heartily of the corned beef. The others had eaten it, but the one who ate the most seemed to be the sickest and was the sickest." An objection to the question was overruled and that ruling is the subject of the first exception.

The witness was cross-examined at length both as to his diagnosis and as to his statement that the appellee had contracted the disease from eating the corned beef, but the examination developed nothing which could permit the court to say that either statement was so inherently incredible as to wholly lack probative force. It is true that Dr. Frank W. Wilson, who testified for the defendant, and whose personal knowledge of actual cases was quite as limited as that of Dr. Williams, disagreed with Dr. Williams' diagnosis, but a mere difference of

opinion between experts could not possibly justify a court in saying that the opinion of one or the other is worthless, since that question is essentially one for the jury to decide.

Much of the medical testimony related to the symptomatology of botulism and gastro-enteritis.

Dr. Williams diagnosed the disease as botulism. Dr. Wilson, upon the same facts diagnosed it as gastro-enteritis, and both relied upon the same text book in support of these conflicting theories. In that situation it was the province of the jury, in the light of the attendant facts and circumstances, to decide which witness was right.

And in view of the flat, positive and uncompromising testimony of Dr. Williams, it must be assumed for the purposes of the case that the appellee suffered from botulism, for it is not for the court to say that the deliberate opinion of a respectable and competent physician who has been in active practice for twenty-three years as to the nature and character of a disease from which his patient suffered has no probative force.

So we come to what is the vital and controlling question in the case. Assuming that appellee suffered from botulism, did she contract the disease from eating the corned beef sold under appellant's label?

The appellee contends that the presence of the *Clostridium Bacillus botulinus* in the corned beef raised a presumption of negligence. It would be more nearly correct to say that upon the facts of the case the presence of the organism in the corned beef would permit an inference of negligence, because while, for reasons stated *infra*, the doctrine of *res ipsa loquitur* may not be invoked to prove the presence of the bacillus, there is evidence that the organism could not have existed in the can unless the can was defective, or unless the manufacturer in the process of its manufacture failed to use the proper means to destroy it. If, therefore, the organism did exist in the can, its existence permitted an inference that the manufacturer had been negligent either in processing or in inspecting

the product. That inference was in no sense conclusive, for it was possible that the can became defective after it had passed out of the appellant's possession. And while ordinarily one who proves that it is possible that a given result was produced by either one of two causes, which are mutually exclusive, actually fails to prove that it was caused by either (*Realty & Mortgage Co. v. Ulrich,* 164 Md. 666, 670, 165 A. 708; *Regent Realty Co. v. Ford,* 157 Md. 514, 146 A. 457; *State, use of Boznango v. Blumenthal-Kahn Electric Co.* 162 Md. 84, 159 A. 106; *Klan v. Security Motors,* 164 Md. 198, 164 A. 235; *Baltimore & P. R. Co. v. State, etc.,* 75 Md. 152, 23 A. 310; *Strasburger v. Vogel,* 103 Md. 85, 63 A. 202; *Wilson & Son v. Blaustein,* 144 Md. 289, 124 A. 886; *Harford County v. Wise,* 75 Md. 38, 23 A. 65, that principle is not applicable to the facts of this case, because the uncontradicted evidence is that the can when opened was sealed, unbroken, and free from defects.

Appellee's theory offers two distinct issues, one, was the organism present in the corned beef when Miss Leasure bought it, the other, if it was, was it there as a result of appellant's negligence. The doctrine of *res ipsa loquitur* invoked by the plaintiff can have no possible application to the first issue. That doctrine only applies to cases in which the thing which produced the injuries complained of was at the time of the negligent act in possession and control of the person to be charged, and, being in his control and possession at that time, if injury subsequently results from its use, condition, or operation under circumstances which permit a reasonable inference that the injury would not have occurred had the actor used reasonable care in the use, operation, or management thereof, a rebuttable presumption of his negligence arises. It can never be invoked to prove that the agency causing the injury was in the control and possession of the defendant, for that fact must be proved by evidence, and not by presumption, which is not evidence. *Jones on Evidence,* sec. 10 g. So the fact that appellee became ill from eating bad food was not evidence that she became

ill from eating bad meat prepared by the appellant, but if there was proof that she was made ill by appellant's bad meat, then an inference might be drawn that the meat was bad because appellant failed to exercise ordinary care to see that the product was wholesome before it offered it for sale and consumption by the public.

That distinction has been illustrated in the many cases in which the doctrine has been considered by this court, beginning with the leading case of *Benedick v. Potts,* 88 Md. 52, 40 A. 1067, and extending to the recent case of *Frenkil v. Johnson,* 175 Md. 592, 3 A. 2nd 479, in which Judge Parke for this court analyzed and reviewed the Maryland cases dealing with the doctrine. In all of those cases the cause of the injury was traced by evidence to some agency, instrumentality, or substance which had at some time been under the control and management of the defendant. So in the bottling cases upon which the appellee largely relies, the proof was that the injurious substance was actually in the container in which defendant had placed it before it was offered for sale, and that the container was unbroken and in the same condition when sold to the consumer as it was when delivered for resale by the manufacturer to the distributor. In *Salisbury Coca-Cola Bottling Co. v. Lowe,* 176 Md. 230, 4 A. 2nd 440, it was proved that petroleum distillate was in an unopened bottle of coca cola which defendant had filled and sold, in *Goldman & Freiman Bottling Co. v. Sindell,* 140 Md. 488, 117 A. 866, it was proved that broken glass was in a bottle of "Whistle" which the defendant had filled and sold. Such cases are authority for the proposition that, after the plaintiff proves that the injurious substance was found in the food in the container, then and only then may negligence be inferred from the fact of its presence, but not for the proposition that its presence in the container may be inferred from the fact that the plaintiff became ill after eating the food packed in the container together with other and different foods.

So the question here is, was there in the case evidence legally sufficient to support a finding that the organism

of botulism was present in the corned beef when Miss Leasure purchased it. The only direct evidence of that fact is found in the testimony of Dr. Williams, who stated that Miss Leasure contracted botulism from eating corned beef, and on his cross-examination gave this testimony: "So that you can't be certain the corned beef caused this illness, or whether it is botulism or gastroenteritis? A. I feel that corned beef caused it. Q. But you can't be certain? A. I am certain of it. Q. You said a while ago you couldn't be. A. It is possible for it to be caused by something else. Q. Then how can you say it was not caused by something else? A. I am certain in this case it was caused by the corned beef she ate. Q. That is your opinion? A. Yes. Q. But you don't know it for a fact? A. Well, going back to the history of the case, and her condition and the way she acted, I feel that it was the corned beef that caused it."

When he was asked on his direct examination to say what caused the botulism, defendant objected. The objection was overruled and the witness gave the answer quoted above. While the question was inartificial in form and badly constructed, it nevertheless contained all the facts and only the facts essential to the formulation of the opinion sought. The inquiry was directed to a matter of which the witness through training and experience might be reasonably expected to have special and peculiar knowledge. All the facts recited were known to him from personal observation as appellee's attending physician, and testified to by her, or told to him by appellee as part of the history of the case. The question went no farther than to request his opinion as to the "cause" of the disease. A layman could not be expected to know that it might be caused by infected food, nor that it could only be caused by infected food nor what kind of food could cause it. It did not specifically request the witness to point out the particular food which did cause it, although it was broad enough to permit that construction.

The weight of authority supports the view that medical evidence as to the cause of a particular disease is ad-

missible (20 *Am. Jur. "Evidence,"* secs. 782, 867, 862, 868, 869; *Castanie v. United Railways Co.,* 249 Mo. 192, 155 S. W. 38 *L. R. A.* 1915 A. 1056, 1045 *et seq.; Green v. Ashland Water Co.,* 101 Wis. 258, 77 N. W. 722; *Standard Oil Co. v. Stern,* 167 Md. 211, 217, 173 A. 205; *Gordon v. Opalecky,* 152 Md. 536, 137 A. 299; *Davis v. State,* 38 Md. 15), where the fact would not ordinarily be discovered by or known to laymen having no special knowledge or skill in the science or practice of medicine. It cannot be said therefore that there was reversible error in that ruling. The answer, it is true, was broader than the question, but if any part of it was objectionable, the defendant should have moved to strike out that part of it. No such motion was made and the evidence is in the case for what it is worth. *Continental Ins. Co. v. Burns,* 144 Md. 429, 437, 125 A. 232; *Pontier v. State,* 107 Md. 384, 68 A. 1059; *Stockham v. Malcolm,* 111 Md. 615, 620, 74 A. 569; *American Syrup & Preserving Co. v. Roberts,* 112 Md. 18, 23, 76 A. 589; *Duvall v. Ridout,* 124 Md. 193, 198, 92 A. 209; *Sahn v. Realty & Insurance Exchange,* 138 Md. 653, 654, 114 A. 567; *Chesapeake Brewing Co. v. Goldberg,* 107 Md. 485, 489, 69 A. 37; *Gibbs v. Gale,* 7 Md. 76; *Sentman v. Gamble,* 69 Md. 293, 308, 13 A. 58, *Slingluff v. Andrew Volk Builders' Supply Co.,* 89 Md. 557, 562, 43 A. 759.

It also appeared that neither on the day appellee, her brother, and her sister became ill, nor on the preceding day, had she eaten any other meat, and it also appeared that on the day when she became ill she had eaten nothing but articles of food which common knowledge and general experience have shown to be wholesome and free from deleterious organisms and toxins, or food which had been cooked. It also appeared that the heat required to cook food would also destroy the botulism organism. In connection with these facts it may be considered that until she had eaten the corned beef Miss Leasure enjoyed good health, that she, her brother and her sister, who also ate the corned beef at about the same time and in much the same way, became violently ill, and that Mrs. Leasure

who ate none of it did not become ill. Giving that evidence its natural weight, considering that Dr. Williams based his statement in part at least upon knowledge gained as the attending physician of Miss Leasure, in view of the past expressions of this court concerning the range of medical testimony (*United Rys. & Elec. Co. v. Corbin,* 109 Md. 442, 453, *et seq.,* 72 A. 606; *Annapolis Gas & Electric Light Co. v. Fredericks,* 109 Md. 595, 600, 72 A. 534), and the conclusions reached in other jurisdictions (see cases collected in notes to sections 378, 379, *Jones on Evidence,* 17 *Cyc.* 324, 20 *Am. Jur. "Evidence"* secs. 862, 865; *Pridgen v. Gibson,* 194 N. C. 289, 139 S. E. 443; *Calder v. Levi,* 168 Md. 260, 264, 177 A. 392; *O'Dell v. Barrett,* 163 Md. 342, 163 A. 191), it cannot be said that Dr. Williams' statement that Miss Leasure contracted the disease from eating the corned beef is entirely without probative force. As a practising physician he must be assumed to possess special knowledge and skill in the sciences of medical chemistry, therapeutics, and bacteriology, and with that knowledge to determine with some confidence the kind and condition of food most likely to harbor the germs of disease. While there was some confusion and conflict as to the length of time within which the disease might develop, it did affirmatively appear that it could have developed in the period between the supper and Miss Leasure's illness. Her symptoms and those of her brother and sister were diagnosed by Dr. Williams as those of botulism, he eliminated other foods she had eaten that day as possible sources of the disease, the three who had eaten corned beef became ill almost simultaneously, and the one who had not was not affected. These facts all tended to support Dr. Williams' conclusion. So it cannot be said that the whole evidence was not legally sufficient to support an inference that the organism was present in the corned beef when the appellee purchased it.

Assuming that it was present in the can at that time, it may also be inferred that its presence there was due to some negligent act or omission of the appellant.

The evidence demonstrates that it could not have existed in the corned beef if it had been properly processed and canned, and the fact that it did exist there permits an inference that it was not properly processed and canned. It is undisputed that if it had been exposed to a temperature of two hundred and forty degrees for two hours and ten minutes that the organism would have been destroyed, and that such an exposure was required by the standard and usual method of processing such food. That the organism was not destroyed is some evidence, therefore, that the beef was not properly processed.

One who manufactures food products for resale and consumption by the public assumes the duty of exercising reasonable care to see that the food is wholesome and free from noxious and deleterious organisms and impurities. *Goldman & Freiman Bottling Co. v. Sindell, supra;* 11 *R. C. L.* 1123; 22 *Am. Jur. "Food"* secs. 103, 104, 26 *C. J.* 784, 785. The cases are by no means in accord as to what is "due care" in such a case. It has been said to be "the highest degree of care" (26 *C. J.* 784; *Parks v. G. C. Yost Pie Co.*, 93 Kan. 334, 144 P. 202), "high duty," and "ordinary care and skill" (*Crump Co. v. J. L. Lindsay,* 130 Va. 144, 107 S. E. 679; *Ann. Cas.* 1918 B, 226), but the difference will ordinarily be found to lie rather in a variance in the vigilance, caution, and skill required to insure the wholesomeness of different products than in the degree of care required. For instance, reasonable care might require very much more elaborate precautions to make sure that canned oysters or canned fish are free from toxic substances or harmful germs than would be needed to make sure that rolled oats are safe and wholesome. But the standard of reasonable care is applied to the manufacturer of a potentially dangerous instrumentality, and there seems to be no sound reason why any different standard should be applied to a manufacturer of food stuffs. *A. L. I. Restatement, Torts,* 394; 22 *Am. Jur. "Food"* sec. 103. There is conflict also in the authorities as to whether the doctrine of *res ipsa loquitur* applies where the harmful food was

taken from sealed and unbroken packages (22 *Am. Jur.* *"Foods,"* sec. 117), but there too the conflict is more often due to the variance in the facts of different cases than to any fundamental difference in principle (105 *A. L. R.* 1039, 1043; 47 *A. L. R.* 150), but there is no question that it is not applicable to the facts of this case, for it has no application where the negligent act which produced the injury is shown by direct evidence. *Frenkil v. Johnson, supra.* And here the direct evidence tended to prove that the harmful bacillus could not have survived in the canned corned beef if it had been sufficiently cooked, so that the poisonous nature of the food, the omission which caused that condition, and the harm that resulted therefrom, are all known, and there is no basis for the application of the doctrine.

It is true that the appellant's evidence was to the effect that the can of corned beef under consideration went through the same process of manufacture as other cans in the same case shown to be free from harmful substances, that that process was standard and the same as that generally used by other manufacturers in processing similar products, and that no harmful substance could exist in the product. If that was true the corned beef could not have made the appellee ill, but the evidence permits an inference that it did make her ill, and that it made her ill because it contained a dangerous and harmful organism. Both theories could not be true and it was the function of the jury and not of the court to decide which was correct.

The plaintiff having established *prima facie* that she was injured by defendant's negligence, the burden of evidence or persuasion was upon the defendant to explain away or rebut the case so made. 20 *Am. Jur. "Evidence"* 133, *Jones on Evidence* sec. 179; 45 *C. J.* 1295 *et seq.* Whether it met that burden was a question for the jury (*Ibid; Northern Central Ry. Co. v. State, use of Gilmore,* 100 Md. 404, 415, 60 A. 19), notwithstanding that there was no direct contradiction of defendant's evidence concerning facts peculiarly within its knowledge

and necessarily not within plaintiff's knowledge. *Jones on Evidence,* sec. 181.

The point that the appellant is not liable to the appellee because the Armour of Brazil Corporation actually manufactured the corned beef is not well taken. The appellant put it out as its own product, and thereby became subject to the same liability as though it were the original manufacturer. 2 *A. L. I. Restatement of Torts,* sec. 400.

Finding no reversible error in the rulings of the trial court, the judgment will be affirmed.

*Judgment affirmed, with costs.*