CLOVERLAND FARMS DAIRY, INC. *v.* ELLIN

[No. 169, October Term, 1949.]

*Decided July 19, 1950.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Nathan Patz* for the appellant.

*Joseph W. Spector* and *Samuel B. Bechkes* for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

Appellee sued appellant and a filling station operator for personal injuries, resulting from drinking a bottle of an orange juice product known as "Green Spot", bottled by appellant and bought by appellee at the filling station. There was a verdict in favor of the filling station operator, but the jury found for appellee against appellant. The case comes here on denial of motions for a directed verdict in favor of appellant, and on denial of motion for judgment *n.o.v.*

The appellee opened the bottle of "Green Spot" at his home, drank part of the contents and was made ill. The remainder of the contents, when examined, showed the presence of an oily film which, upon chemical analysis, was found to be kerosene, or some petroleum material in the kerosene range.

Bottles of "Green Spot" were kept at the filling station, in a Coca Cola cooler outside of the building and adjoining it, and about fifteen feet from a kerosene pump. Appellant delivered these bottles to the filling station, and appellant's employees would put the bottles in the cooler, together with ice which they brought on the

delivery trucks. The cooler was serviced every day. When customers or employees wanted a bottle, they would go to the cooler and help themselves, paying the operator of the filling station. Neither the latter or his employees ever served customers with "Green Spot". In other words, purchases made of bottles from the cooler were what have become known as "self-service" operations.

The appellant was allowed to produce evidence, which was not contradicted, showing that "Green Spot" was not carbonated, and, therefore, the metal caps on the tops of the bottles were not airtight, and were more easily removable than such caps on Coca Cola bottles or containers of similar beverages. It also showed that, through capillary action, liquid from the outside could infiltrate into the "Green Spot" bottles. This could happen if a warm bottle was placed in ice water in such a manner that the water covered the cap or part of it. Appellant suggested, based on these facts, that some employee of the filling station with kerosene on his hands, might have gotten a bottle from the cooler, in so doing might have left kerosene in among the other bottles lying on their sides in the melted ice, and, by this means, kerosene might have entered the bottle purchased by the appellee. There was no evidence that this happened. The appellant also offered evidence, likewise uncontradicted, that there was no kerosene or similar substance around its plant where the "Green Spot" was bottled, and that in the process of such bottling, as it was conducted at its plant, it would have been impossible for kerosene to have entered the bottles.

On these facts, appellant contends that its case is essentially different from the cases involving completely sealed containers, that there is no evidence of its negligence and that the case against it should not have been submitted to the jury.

In the case of *Armour & Co. v. Leasure,* 177 Md. 393, 9 A. 2d 572, 578, a housewife bought a can of corned beef, and prepared a meal from it. Those who ate the meal

were made violently ill. There was no analysis of the remains of the corned beef, and one of the questions discussed was whether these facts, and the testimony of a physician that the plaintiff was suffering from botulism, a disease caused by an organism found in food, which organism, in his opinion, was in the corned beef, was sufficient to justify the submission of the case to the jury. The court held that the presence of the injurious substance in the sealed can when it was purchased was sufficient to create an inference that the manufacturer was negligent, but that the mere fact that people were made sick did not create an inference that the injurious substance was in the can. This had to be proved, but there was sufficient proof in the testimony of the physician that in his opinion the plaintiff was made ill by the organism in the corned beef, which was the only thing eaten which could have contained such an organism. There was no testimony, other than that of the physician, that such an organism was in any of the contents of the can. In reaching its conclusion, the court referred to two previous bottling cases in which it said "* * * the proof was that the injurious substance was actually in the container in which defendant had placed it before it was offered for sale, and that the container was unbroken and in the same condition when sold to the consumer as it was when delivered for resale by the manufacturer to the distributor."

The court also said "It would be more nearly correct to say that upon the facts of the case the presence of the organism in the corned beef would permit an inference of negligence, because while, * * * the doctrine of *res ipsa loquitur* may not be invoked to prove the presence of the bacillus, there is evidence that the organism could not have existed in the can unless the can was defective, or unless the manufacturer in the process of its manufacture failed to use the proper means to destroy it. If, therefore, the organism did exist in the can its existence permitted an inference that the manufacturer had been negligent either in processing or in inspecting

668

the product. That inference was in no sense conclusive, for it was possible that the can became defective after it had passed out of the appellant's possession. And while ordinarily one who proves that it is possible that a given result was produced by either one of two causes, which are mutually exclusive, actually fails to prove that it was caused by either, * * that principle is not applicable to the facts of. this case, because the uncontradicted evidence is that the can, when opened, was sealed, unbroken and free from defects." And "So the fact that appellee became ill from eating bad food was not evidence that she became ill from eating bad meat prepared by the appellant, but if there was proof that she was made ill by appellant's bad meat, then an inference might be drawn that the meat was bad because the appellant failed to exercise ordinary care to see that the product was wholesome before it offered it for sale and consumption by the public." And speaking of the earlier bottling cases, "Such cases are authority for the proposition that, after the plaintiff proves that the injurious substance was found in the food in the container, then and only then may negligence be inferred from the fact of its presence, but not for the proposition that its presence in the container may be inferred from the fact that the plaintiff became ill after eating the food packed in the container together with other and different foods." The court then found that it could not be said that the whole evidence was not legally sufficient to support the inference that the organism was present in the corned beef when the appellee purchased it, and said "Assuming that it was present in the can at that time, it may also be inferred that its presence there was due to some negligent act or omission of the appellant." And "The plaintiff having established *prima facie* that she was injured by defendant's negligence, the burden of evidence or persuasion was upon the defendant to explain away or rebut the case so made. * * * Whether it met that burden was a question for the jury, * * * notwithstanding that there was no direct contradiction of defendant's evidence con-

cerning facts peculiarly within its knowledge and necessarily not within plaintiff's knowledge."

In the earlier case of *Goldman & Freiman Bottling Co. v. Sindell*, 140 Md. 488, 496, 117 A. 866, 869, a bottle of "Whistle" was purchased at a store, opened in the presence of a purchaser, and handed to him. While drinking its contents he felt something sharp and it eventually appeared that the bottle had broken glass in it. The evidence showed that the wife of the proprietor of the store took the bottle out of the ice box, opened it and handed it to the plaintiff. The proprietor testified that after the plaintiff bought the bottle, he did not put anything in it, nor did he take anything out of it, and that it was sold in the same condition as when he purchased it. There was evidence in the case, as is usual in such cases, that the beverage was bottled with such care that no foreign particles could possibly have gotten in the bottle while it was in the possession of the Bottling Company. The Bottling Company, therefore, urged that this showed the glass was not in the bottle when it sold it. The court said "The solution of that conflict is purely a jury question, with which we have nothing to do, the only question before us being whether the evidence in the case permits the conclusion that the defendant was guilty of negligence charged in the declaration." And after stating that in consideration of the question the court must assume that there was broken glass in the bottle, the fact that there was evidence that the bottle was in its original condition when it was handed by the storekeeper to the plaintiff, was held to be proof that the glass was in the bottle when it was sold by the Bottling Company to the storekeeper, and from that fact an inference of negligence could be drawn. In the other two bottling cases decided, (*Salisbury Coca-Cola Bottling Co. v. Lowe*, 176 Md. 230, 4 A. 2d 440, and *Coca-Cola Bottling Works v. Catron*, 186 Md. 156, 46 A. 2d 303), the question of the insufficiency of evidence was not raised.

In the case before us there is no evidence whatever that the bottle was tampered with or even touched by anyone but the agent of the appellant who brought it to the cooler and the appellee who took it out. This is evidence that the kerosene was in the bottle at the time it was delivered by the appellant to the filling station. As we have stated, the only evidence to the contrary is that showing the method of bottling which, as in the *Armour* case, and in almost all similar cases, is uncontradicted, because it is something peculiarly within the knowledge of the manufacturer, about which the plaintiff has no information. That kind of uncontradicted testimony, however, the court, in the *Armour* case, said presents a question for the jury.

Appellant contends that the rule as to sealed containers should not apply where bottle caps are not airtight, and that in such cases no inference should be drawn that the manufacturer was negligent. The inference is not based on the type of sealing. It is based on the fact that the manufacturer has put out for human consumption food or drink which is sold by dealers in the original packages. When such an original package is first opened, and there is found in it a harmful substance, that is, in itself, evidence that such substance was in the package when delivered by the manufacturer, and raises the inference of negligence. This inference is, of course, rebuttable, but the offsetting evidence, whether of care used in the making of the original package, or of some tampering with it after it left the hands of the manufacturer or of some improper use of the contents, raises a question of fact for the jury. The inference is drawn in the first instance, if the package was purchased unopened by the consumer, and that inference does not depend on the nature of the package.

A manufacturer of an article for human consumption is not an insurer, but he is, nevertheless, bound to exercise care, commensurate with his undertaking, to see that no injurious substance gets into the containers in which he places his product. A member of the public who eats

or drinks such a product from a sealed container could rarely, if ever, prove how an injurious substance got in it. The only person who has a chance of showing the facts about this is the manufacturer, and the burden is, therefore, placed upon him. When he seals his product and delivers it for resale, and the original package, when broken, discloses something that should not be there, that is evidence that it was there when the package was sealed. The consequent damage is not caused by the purchaser. It is not caused by the dealer who sells the product in its original package. Therefore, it must be caused by something which was inadvertently or negligently done at the time it was made up and sealed and sent out by the manufacturer for consumption, and the inference of negligence arises.

In the instant case, the appellant's theory is that the bottle fell on its side in water formed by the melting of the ice, that by handling by other people, probably those employed by the filling station in the sale of kerosene, some of the latter substance got in the water and seeped into the top of the bottle. To support this theory there is not a shred of evidence. It is not shown that any employee or any other person who was engaged in selling kerosene, or who had kerosene on his hands, had gotten any bottle out of the cooler, or had opened the cooler or had handled any of the bottles in it. This is, therefore not a case where the proof shows the damage might have been produced by one of two mutually exclusive causes, because, as in the Armour case, there is no evidence that the bottle, when opened, was not in its original condition, and the cap was not shown in any way to be defective. There is no question before us as to the admissibility of the evidence offered to show a possible way in which the kerosene might have gotten into the bottle. That evidence was admitted, the jury had it before it, and evidently came to the conclusion that it did not happen that way. The appellant had at least as much as it was entitled to when the jury considered that theory without any evidence to support it.

The fact that the bottle, when purchased from the filling station in its original condition, contained kerosene, raises an inference of negligence on the part of the manufacturer. The question whether other evidence in the case rebuts this inference, is one for the jury, and the trial court was correct in permitting the jury to decide it.

*Judgment affirmed with costs.*

MARKELL, J., delivered the following dissenting opinion, in which HENDERSON, J., concurs.

Plaintiff bought three bottles of "Green Spot" at the filling station of the co-defendant, East, took them home, opened one, poured out and drank part of the contents and was thereby made ill. On examination of the bottle it was found that the contents were covered by an oily film which had a strong kerosene odor and on chemical analysis was found to be kerosene—or "a petroleum material in the kerosene range."

At East's filling station kerosene was handled and sold in bulk. "Green Spot" was kept for sale, outside the building, "in a Coca Cola Cooler" that sat "right adjoining the building". The cooler was about fifteen feet from the kerosene pump. "Green Spot" was delivered by defendant to its customers, including East, on its "regular milk trucks, along with the milk". East would order "Green Spot", defendant's driver would bring it, put it in East's cooler and also put in the cooler ice he brought on the truck. If there was a surplus brought (beyond what the cooler would hold) the cases were put on the inside of East's building. East was "serviced" by defendant every day, but did not necessarily buy "Green Spot" every day. When customers of East, including any of his employees, wanted to make purchases, they went over to the cooler and helped themselves at all times—and then paid East. His employees never served customers.

"Green Spot" bottles, like Coca Cola, milk and other beverage bottles, had metal caps. From the specimen

exhibited at the argument it appears that the caps may easily be removed and replaced. Unlike Coca Cola and other "soft drinks", (e. g., "Whistle", *Goldman & Freiman Bottling Co. v. Sindell,* 140 Md. 488, 495, 117 A. 866), "Green Spot" is not carbonated. The caps, therefore are not airtight. Defendant produced testimony, which was not contradicted, that through capillary action liquid from the outside may infiltrate into a filled and capped bottle. If a bottle is warm and is put in some cold liquid (e. g., if it is laid or falls sidewise or is upset in melted ice or other iced water) chilling of the interior and contraction of the contents will create a vacuum and draw some of the liquid under the cap into the bottle. If an employee of East or anyone else, with kerosene on his hands, handled the contents of the cooler, kerosene could thus be drawn into a bottle. There is no evidence that kerosene in fact got into the bottle in question in this way.

Defendant's plant manager testified that kerosene is not kept at defendant's dairy at all. The witness described in detail how "Green Spot" is prepared and bottled and specifically how the bottles are washed by machinery. He says it is impossible for any fluid to be in a bottle before it is filled.

This court has repeatedly held that the presence of an injurious substance in the bottle or other container of an article of food or drink when it is sold by the manufacturer in a sealed container for public consumption is evidence from which negligence on the part of the manufacturer may be inferred, whether by an inference like any other rational inference from circumstantial evidence or by one labeled *res ipsa loquitur.* *Goldman & Freiman Bottling Co. v. Sindell,* 140 Md. 488, 117 A. 866 (broken glass in a bottle of "Whistle") ; *Salisbury Coca-Cola Bottling Co. v. Lowe,* 176 Md. 230, 4 A. 2d 440 (coal oil in a bottle of Coca Cola) ; *Armour & Co. v. Leasure,* 177 Md. 393, 9 A. 2d 572 (disease organism in a can of corned beef) ; *Coca Cola Bottling Works v.*

*Catron,* 186 Md. 156, 46 A. 2d 303 (dead mouse in a bottle of Coca Cola).

Testimony of care exercised by the manufacturer generally in preparing and sealing the product is not enough to destroy the inference and require the withdrawal of the case from the jury.

But in the *Goldman* case the court was careful to point out that the inference or presumption of negligence is predicated upon a finding that the extraneous matter was in the container when it left the hands of the manufacturer. In that case there was testimony by the dealer that the bottle was in the same condition when sold as when it came into his hands, although this was criticized as a mere conclusion by one of the dissenting judges. In *Armour & Co. v. Leasure, supra,* there was medical testimony that the disease organism could not have developed after the can was opened, and no evidence that the can was defective, hence there was a strong inference that it was in the can when sealed by the manufacturer. In *Salisbury Coca-Cola Bottling Co. v. Lowe,* and *Coca-Cola Bottling Works v. Catron, supra,* prayers for a directed verdict on the question of liability were not pressed.

In the instant case there was no evidence that the bottle was in the same condition when opened as when it was delivered to the dealer. It remained for an indeterminate time in an open cooler, accessible to anyone, in close proximity to a kerosene drum. In some of the cases in other jurisdictions the point has been stressed that where bottle caps are of a type that may be readily removed and replaced, and opportunities for tampering are shown, the inference that the foreign substance was in the container when originally sealed becomes mere speculation. *Coca Cola Bottling Works v. Sullivan,* 1942, 178 Tenn. 405, 158 S. W. 2d 721, 171 A. L. R. 1200; cf. *Jones v. Mercer Pie Co.,* 1948, 187 Tenn. 322, 214 S. W. 2d 46. See also *Bourcheix v. Willow Brook Dairy,* 268 N. Y. 1, 196 N. E. 617, 98 A. L. R. 1492, and notes 47 A. L. R. 148, 105 A. L. R. 1039, 171 A. L. R. 1209.

In the instant case there is testimony that the kerosene could have entered the bottle even without removal of the cap. This could not be true as to glass or a dead mouse. The most that the plaintiff has shown is that there are two equally possible hypotheses, upon one of which the appellant could be liable and on the other not liable. Cf. *Perdue v. Brittingham*, 186 Md. 393, 404, 47 A. 2d 491; *Morris v. Twigg*, 190 Md. 324, 58 A. 2d 719, 722; *Krell v. Maryland Drydock Co.*, 184 Md. 428, 41 A. 2d 502; *Charlton Bros. Transp. Co. v. Garrettson*, 188 Md. 85, 94, 51 A. 2d 642; *Armour & Co. v. Leasure*, 177 Md. 393, 405, 9 A. 2d 572.

Plaintiff argues that defendant was negligent in not making "Green Spot" bottles impervious to any outside liquid. This contention has no support in principle or authority. A manufacturer is liable only for negligence in selling a bottle containing an injurious substance, not as an insurer against the consequences of every possible use or abuse of a bottle which contained no injurious substance when sold by him. A manufacturer would not be liable for the consequences of using penicillin or similar drugs after they have deteriorated by being kept too long or kept in an improper temperature by an intermediate or ultimate purchaser. Plaintiff also argues that "Green Spot" continued in defendant's "control" after delivery by defendant to East, because defendant's driver "serviced" it once a day and East's employees did not service it at all. The fact that East's employees did not exercise any active "control" over the bottles does not indicate that defendant had any control over them after delivery, but merely that no one at all exercised any control or care whatever over them to prevent any careless handling or mishandling of them by employees of East or other purchasers or by any trespassers, prowlers or miscreants.

It is said that there is no evidence that the bottle was tampered with or even touched by anyone but the agent of defendant who brought it to the cooler and plaintiff, who took it out, and that *this* is evidence that the kerosene

was in the bottle at the time it was delivered to the filling station. This statement ignores the difference between facts and possibilities and inverts the only reasonable inference of fact or possibility that might be drawn from the evidence. In view of the undisputed fact that the bottle was kept out of doors at the filling station, where it could be handled or tampered with by anybody at all and was intended to be handled by any would-be purchaser, and of defendant's uncontradicted and persuasive evidence that the kerosene could not have been in the bottle when it was delivered to the filling station, it would be more plausible to say that the fact that plaintiff found kerosene in the bottle is evidence that it was handled and tampered with after it was delivered to the filling station. It may be that in the face of evidence to the contrary, the jury might have disbelieved defendant's evidence. But in the absence of any such evidence, the jury could not assume it, whether it believed defendant's evidence or not. By such a process of inference mere absence of evidence of an alibi would be evidence of guilt. In the *Armour* case the evidence affirmatively showed that the diseased organism could not have entered the can after it was packed.

It is also suggested that an inference that the kerosene was in the bottle when it was delivered to the filling station need not be based on any rational ground for inference, but may be based on the mere fact that the manufacturer has made a drink for human consumption which is sold by dealers in the original packages. In the *Armour* case, the *Goldman* case and other cases this court has repeatedly held the contrary, *viz.*, that the presence of the deleterious substance in the food or drink, when delivered by the manufacturer, must be proved as a fact by direct evidence or by rational inference from circumstantial evidence, and only then can negligence of the manufacturer be inferred. The manufacturer owes no higher degree of care with respect to carbonated drinks than with respect to uncarbonated drinks, but he is not, with respect to either, an insurer against accidents

or against negligence of others, after the drink has been delivered by him. In drawing inference from circumstantial evidence courts cannot ignore the difference between a champagne bottle and a sponge, or any other difference in facts which is relevant to the inference to be drawn. A manufacturer cannot control the handling or mishandling of bottles out of doors at a filling station, which is visited once a day by the manufacturer's truck driver, but is conducted without any care or supervision at all on the part of the operator of the filling station. No one is compelled to conduct such a place in such a way, or to buy food or drink at such a place.

In the absence of evidence that the bottle in question contained kerosene when delivered by defendant to East, defendant's motions for a directed verdict and for judgment *n.o.v.* should have been granted.

Judge HENDERSON authorizes me to say that he concurs in this dissent.