# GREAT ATLANTIC AND PACIFIC TEA COMPANY *v.* ADAMS

[No. 197, October Term, 1956.]

*Decided June 5, 1957.*

The cause was argued before COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.; and KINTNER, J., Associate Judge of the Second Judicial Circuit, specially assigned.

*Walter C. Capper* and *Thomas N. Berry,* for appellant.

*Edward J. Ryan* and *William L. Wilson,* with whom was *Walter W. Dawson* on the brief, for appellee.

KINTNER, J., by special assignment, delivered the opinion of the Court.

This is an appeal from a judgment entered on the verdict of a jury in an action brought by the appellee, Steven Adams, against the appellant, The Great Atlantic and Pacific Tea Company, the court having overruled the appellant's motion for judgment n.o.v.

The declaration alleges that Mary Adams, agent of the plaintiff (she was his wife) purchased from the defendant at its retail store certain lettuce, which it impliedly warranted to be free from all harmful ingredients and safe and fit for the use for which it was intended; that the plaintiff ate some of the lettuce and as a result thereof was made violently ill; that the lettuce was not fit for human consumption and that the defendant is liable as a result of its breach of an implied warranty.

In considering the evidence in the case we must assume as true all evidence tending to support the appellee's claim and all inferences reasonably deducible therefrom. The appellee's wife, Mary Adams, testified that on November 27, 1953, about four o'clock p. m. she went into the A. & P.

market in Frostburg and bought some groceries including two heads of lettuce which she picked from a bin in the back of the store; that she took the lettuce home, washed it, pulled off the outer leaves and put it in a plastic bag in the frigidaire. She kept it there until Sunday, November 29th. On Sunday they had a family dinner at which there were present thirteen persons, Mr. and Mrs. Adams, their son, their three married daughters with their husbands and children. The meal consisted of a roasted chicken and dressing, mashed potatoes, bread and salad. The first bowl of salad was prepared by her daughter, Mary Hoban, and the second bowl by Mrs. Adams. It contained mayonnaise, salt, vinegar and the lettuce purchased from the appellant. Everything was eaten except a half cup or cupful of salad which she put in the frigidaire. Everyone ate salad except Paul Wright, a son-in-law. About nine o'clock everybody went home, leaving Mr. and Mrs. Adams and their son, William, aged seventeen. About eleven o'clock they went to bed and then "we could feel ourselves getting sort of sick and then dysentery and vomiting and then after that we didn't know nothing, we just passed out and lost all control of ourselves sometime during the night." She remembers nothing else until she became conscious in the hospital on Monday or Tuesday.

The appellee testified that he ate some of the salad. He felt bad that night, but slept. He went to work the next day but he did not know he went, did not know what he did at the factory, where he was employed as a janitor and knew nothing until he woke up in the hospital.

William Adams, son of the appellee, testified that at that time he lived at home with his parents. He was present at the dinner and ate some of the lettuce. He retired about eleven o'clock and "after I went to bed I sort of felt a little pain in the stomach and that and something happened to me and I went unconscious and around the next morning I sort of come to a little bit and just passed out and couldn't go to school. * * * I just had pains in the stomach and that and I was so weak and I was on the couch and couldn't get off the couch to go to the lavatory and had to go right there." He first became conscious in the hospital.

Mary Hoban, daughter of the appellee, testified that she and her husband partook of the dinner. She prepared the first bowl of salad. She got the lettuce out of the frigidaire and put salt, mayonnaise and vinegar and lettuce in the salad. Before that she washed her hands. The lettuce was in a plastic bag; she ran water over it, added the other ingredients and mixed it with a spoon. The second bowl was fixed by her mother. After she, her husband and child got home they all became ill, vomiting, running of the bowels, extreme weakness.

Paul Wright, his wife who was a daughter of the appellee, and their two children partook of the dinner. His wife and children ate the lettuce salad and were taken sick and were taken to the hospital. At the dinner he ate mashed potatoes, gravy, dressing, three slices of bread with mayonnaise, and also drank coffee. He did not eat any of the lettuce salad. He did not become sick.

On Tuesday three women went to the Adams house to clean the place. One of them found a bowl of salad in the refrigerator. She got it out and gave it to another who put it on the table. The third woman scalded out two jars, put the salad in them and took them to the Medical Center in Cumberland.

Dr. John Devers, physician, called to the Adams home on Monday evening, found the appellee, his wife and son very acutely ill. They were suffering from some sort of dysentery. He sent them to the hospital. He obtained stool specimens from all three and sent them to the laboratory in Cumberland.

Arnold W. Gunther, called by the appellee, is a bacteriologist in charge of the State Health Department laboratory. On December 2, he received a sample of salad sent in by Dr. Devers. It was cultured by him and in it he found the bacteria shigella sonnei. He did not use the lettuce itself for the culture but the fluid which was in the jar. He also examined a stool specimen from the appellee and in it found shigella sonnei. He testified that this is an organism or germ, measuring about one twenty-five thousandths of an inch, rod-shaped, has no movement, grows rapidly on appropriate culture media; it is usually found in human fecal

matter; it can become attached to food from soiled fingers, by persons picking up articles and handling them. He did not think it could exist as a result of use of fecal matter for cultivation purposes. Raw lettuce would not be a favorable media for the germ to grow.

Witnesses for the appellant testified that the lettuce was grown in Arizona, shipped in refrigerated cars to Altoona, transferred to refrigerated trucks by which it was delivered to the Frostburg store. On the day of this purchase about 120 heads of lettuce were received. It was placed in a rack, where customers could handle and select what they wished.

From the evidence most favorable to the appellee the jury could have found that the lettuce contained the bacteria; that the appellee ate the contaminated lettuce and that his illness was so caused. But there is no evidence in the case as to when the shigella sonnei got on the lettuce. The evidence is that this germ has no movement; it is inert; lettuce is not its natural habitat; its source is human fecal matter; it could have been deposited on the lettuce by contaminated fingers. It was handled by persons both before and after the sale. Mrs. Adams picked out the lettuce, took it home and put it away. She and her daughter handled it in preparing the salad. Thirteen people, four of whom were children, sat at the family dinner, where first one bowl was consumed and then a second prepared and partly consumed. The possibilities are just as great that the lettuce became contaminated after it left the store of the appellant as before.

The fact that this action is for the breach of an implied warranty does not relieve the appellee from the burden of proving such breach. It is important here to review the food poisoning cases to determine the principles involved. There are two common classes of such cases, namely the sealed container cases and the trichinosis cases. The first class is numerous and will be discussed later. The second class is illustrated in *Vaccarino v. Cozzubo,* 181 Md. 614. The judge who ruled on a demurrer in the instant case said he could see no difference between the sale of the lettuce in this case and the sale of the sausage in the case cited. But there is a difference, as an examination of that case will show. This

526

Court said "Trichinosis is a disease caused by trichinae, nematodes which are occasionally found in pork and which breed in the human body * * .*." The expert testifying in that case said that it could be prevented in these ways: (1) stop feeding garbage to hogs, (2) cook the garbage, (3) refrigerate the meat 21 days, (4) cook the pork thoroughly. From this it must be clear that trichinae originate in the live animal. Indeed it is a fact so commonly known as to be judicially noticed. It follows that the trichinae must have been in the sausage when it was sold. We may say that in the cases of sales of pork and pork products, where trichinosis develops, there is a strong logical inference that the contamination existed at the time of the sale.

The sealed container cases are decided on the same principle. Where the foreign substance or injurious ingredient is found in a sealed bottle or can there is a strong presumption that: (1) it was there at the time of the sale, and (2) the bottler or manufacturer was negligent. *Bottling Co. v. Sindell,* 140 Md. 488; *Armour & Co. v. Leasure,* 177 Md. 393; *Coca-Cola Bottling Wks. v. Catron,* 186 Md. 156; *Cloverland Farms Dairy v. Ellin,* 195 Md. 663.

The doctrine of *res ipsa loquitur* has no application in this case. It may not be invoked to show that the organism was on the lettuce at the time of the sale. *Ellin* case, *supra; Leasure* case, *supra.*

In the instant case it is clear from the evidence produced by the plaintiff himself that the contamination of the lettuce might have occurred either before or after it left the appellant's store. In *Todd v. Ferrell,* 212 Md. 574, 584, Chief Judge Brune speaking for this Court, said "However, in any action for damages the court is not justified in inferring negligence merely from possibilities. A mere surmise that there may have been negligence on the part of the Defendant will not justify the court in submitting the case to the jury."

In an action on an express warranty it is incumbent on the plaintiff to prove the unsoundness of the article at the time of the sale. *McCeney v. Duvall,* 21 Md. 166; *Fenwick v. Forrest,* 5 Harris & J. 414. It is undoubtedly the settled law that to recover on an express warranty the burden of proof

is on the plaintiff to establish that the article sold did not at the time of sale conform to the representations of the warranty. This rule of law applies with equal force to an implied warranty.

The same principles as to proof apply whether the plaintiff is attempting to prove negligence or to prove the breach of an implied warranty. If the plaintiff's own evidence shows two equally possible causes, for one of which the defendant would not be responsible, he cannot recover.

We hold that the appellant's motion for a directed verdict or for judgment n.o.v. should have been granted.

*Judgment reversed with costs to appellant.*